967 F.2d 826
 Gina CECERE, Plaintiff-Appellee,
v.
The CITY OF NEW YORK; William J. Grinker, Administrator,
Human Resources Administration; Brooke Trent, Deputy
Commissioner, Special Services for Children, New York City
Human Resources Administration; Edna Davis, Director, Bronx
Field Office, Special Services for Children, Tearance
Rodgers, Caseworker, Special Services for Children; Robert
Puryear, Supervisor, Special Services for Children; and
Elda Brown, Defendants,
Robert Puryear, Supervisor, Special Services for Children,
Defendant-Appellant.
 No. 483, Docket 91-7569.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 14, 1991.
Decided June 26, 1992.
 
 Ira J. Lipton, New York City (Victor A. Kovner, Corp. Counsel of City of New York, Stephen J. McGrath, Jordan Sklar, Marian P. McElhinney, New York City, of counsel), for defendant-appellant.
 Peter B. Ackerman, White Plains, N.Y. (Harold, Salant, Strassfield & Spielberg, of counsel), for plaintiff-appellee.
 Before: LUMBARD, NEWMAN, and WINTER, Circuit Judges.
 WINTER, Circuit Judge:
 
 
 1
 Gina Cecere commenced this action in the Southern District of New York, alleging that Robert Puryear, a supervisor in the Bronx field office of the Office of Special Services for Children ("SSC"), various New York City agencies and employees, and Elda Brown, Cecere's mother, violated her civil rights. Cecere alleges that the defendants deprived her of custody of her daughter, Kristen Hamlin, without due process. Judge Cannella granted summary judgment on grounds of qualified immunity for all defendants except Tearance Rodgers, an SSC caseworker, Puryear and Brown. It appears that Rodgers has never been served. Judge Cannella denied Puryear's motion for summary judgment based on a claim of qualified immunity, and Puryear appeals. We have appellate jurisdiction under the so-called collateral order doctrine. See Cooper & Lybrand v. Livesay, 437 U.S. 463, 468, 98 S.Ct. 2454, 2457, 57 L.Ed.2d 351 (1978). Finding that Puryear enjoys a qualified immunity, we reverse.
 
 
 2
 SSC's involvement began on April 2, 1986 when pediatric nurse Leah Harrison of Montefiore Hospital filed a child abuse report concerning Kristen. Harrison had been the primary health care provider for Kristen since birth and was familiar with Cecere and Cecere's mother, Brown. Harrison made this report after a conversation with Brown. In it, she noted that Cecere had a history of drug and alcohol abuse. It stated that "[i]t is believed that she is using drugs and alcohol and is unable to care for the child." This report was forwarded to the Bronx field office of SSC. As a result, Philip Kaufman, who was, like Puryear, a supervisor in SSC's protective services unit, went to Cecere's home. He observed both Cecere and Kristen and indicated that he was assigning a caseworker named Tearance Rodgers to their case. Kaufman also spoke with Brown, who voiced concerns regarding her granddaughter's well-being. Upon being assigned to this case, Rodgers received a briefing from Kaufman about the results of his investigation. Kaufman's uncontradicted affidavit states that he conveyed "all the information" he had garnered to Rodgers.
 
 
 3
 The record on appeal demonstrates that Kaufman and Rodgers had reason to believe the following. Cecere was a single mother. Her daughter Kristen was three years old. Since her teenage years, Cecere had suffered from drug and alcohol dependency and from psychiatric and emotional problems, including suicidal tendencies. Cecere regularly left Kristen with relatives, sometimes for lengthy periods of time. On one such occasion, in or around December 1985, Cecere left Kristen with her great-grandmother, Brown's mother, for over three months. During this period, Brown enrolled the child in nursery school, to which Brown took her every day. On March 31, 1986, Cecere, who was drunk at the time, arrived at the great-grandmother's house and took Kristen. A few days before, Cecere had discussed committing suicide with Brown.
 
 
 4
 While Kristen was in her care, Cecere rarely took the child to nursery school, for which Brown was paying tuition. During this period, Brown learned that Cecere, who was unemployed, had no money and no food. Brown, whose relationship with Cecere was strained, asked an intermediary to take some groceries she provided to Cecere. On April 23, 1986, Cecere asked Brown to care for Kristen in her home because Cecere felt ill and was going to the hospital. Brown states that there were no clean clothes for Kristen at Cecere's residence.
 
 
 5
 On Friday, April 25, Rodgers consulted with Robert Puryear, his acting supervisor in the Bronx field office, concerning Kristen. Kaufman, Rodgers' regular supervisor, was on vacation for the week of April 21. Rodgers told Puryear that Brown was currently caring for Kristen after Cecere had voluntarily taken her there. Rodgers recommended that child abuse or neglect proceedings be commenced against Cecere and showed Puryear a copy of a letter, dated April 25, 1986, that Rodgers had drafted. The letter was intended to prevent Cecere from taking Kristen from Brown until proceedings could be commenced in family court.
 
 
 6
 After hearing Rodgers out, Puryear agreed that proceedings should be brought against Cecere and signed the letter, which read:
 
 To all Law Enforcement Agencies:
 
 7
 This is to inform you that the Brown family is known to us. In lieu of pending court action; the child Kristen Hamlin is to remain with the maternal grandmother, Ms. Elda Brown....
 
 
 8
 Please take due notice, that pending the results of court action, this child Kristen Hamlin, is not to be in the custody of her mother, Ms. Gina Brown [Cecere], under no circumstances!
 
 
 9
 At some undetermined time after Brown was given this letter, Cecere attempted to contact her mother about seeing Kristen, but failed. When she finally contacted Brown, Brown refused to let her see the child. On or about April 29, 1986, Cecere called Kaufman, who had returned from vacation, and told him that Brown was preventing her from seeing her child. After reviewing Kristen's file, Kaufman decided not to bring proceedings against Cecere. He called Brown that same day and informed her that the April 25 letter did not constitute a grant of custody and no longer had any effect. Brown, however, remained fearful for her granddaughter's safety, and an attorney she had retained informed Kaufman that the letter would be used in a child custody suit. Kaufman repeated that the letter was not a grant of custody and was of no effect.
 
 
 10
 In early May, Cecere informed Kaufman that a custody hearing was to be held. Kaufman accompanied her to the courthouse, but no such hearing was scheduled. On May 7, Cecere came to the Bronx field office and informed Kaufman that she had obtained a court order directing that Kristen be turned over to her. SSC paid for a cab to take Cecere to her mother's house to enforce the order. A few days later, Cecere informed Kaufman that she had not been able to enforce the order. Brown appears to have retained custody of Kristen until the following year.
 
 
 11
 Plaintiff commenced this action on March 22, 1988. She alleged civil rights violations under 42 U.S.C. §§ 1983, 1985(3) and 1986 and under the Fourteenth Amendment. Judge Cannella dismissed the Sections 1985 and 1986 claims on the ground that Cecere had "failed entirely to point to any evidence of class-based discriminatory animus." Judge Cannella also granted motions for summary judgment based on qualified immunity as to the Section 1983 claims for all defendants except Rodgers, Puryear and Brown. Rodgers, as noted, appears never to have been served. Brown, being a private individual, has no claim to such an immunity. See Dennis v. Sparks, 449 U.S. 24, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980). As for Puryear, the district court held that summary judgment on the ground of qualified immunity was not proper because material issues of fact existed. These disputed issues related to whether it was "objectively reasonable" for Puryear to believe that emergency circumstances existed at the time he wrote the April 25 letter. Principally, Judge Cannella relied upon the lack of evidence that Puryear probed Rodgers concerning the scope of his investigation and that Rodgers' investigation was in fact adequate.
 
 
 12
 The defense of qualified immunity shields governmental officials from civil liability if the official's conduct did not violate constitutional rights that were clearly established at the pertinent time or if it was objectively reasonable for the official to believe that the conduct did not violate such rights. Al-Jundi v. Mancusi, 926 F.2d 235, 237 (2d Cir.) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818-19, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)), cert. denied, --- U.S. ----, 112 S.Ct. 182, 116 L.Ed.2d 143 (1991); see also Robison v. Via, 821 F.2d 913, 921 (2d Cir.1987) (police officer and state attorney shielded by qualified immunity where they removed children from mother's custody after schoolmates reported sexual and physical abuse); Doe v. Conn. Dept. of Child and Youth Services, 911 F.2d 868, 869 (2d Cir.1990) (same as to state welfare officials). When a qualified immunity is asserted in a motion for summary judgment, of course, the facts material to the claim of qualified immunity must not be genuinely disputed. We believe that Puryear sustained his claim.
 
 
 13
 In 1986, when the April 25 letter was signed and given to Brown, it was clearly established that a parent's interest in the custody of a child was a constitutionally protected liberty interest subject to due process protection. See Stanley v. Illinois, 405 U.S. 645, 649-58, 92 S.Ct. 1208, 1211-16, 31 L.Ed.2d 551 (1972). However, it was also settled that a child could be taken from the parent's custody without a hearing if "the child is immediately threatened with harm, ... where the child is left bereft of care and supervision, or where there is evidence of serious ongoing abuse and the officials have reason to fear imminent recurrence." Hurlman v. Rice, 927 F.2d 74, 80 (2d Cir.1991) (citation omitted).
 
 
 14
 Puryear's sole act that might sustain a finding of liability is the signing of the April 25 letter. We need not and do not endorse the form of the letter because the only issue before us is whether the assertion of custodial authority by Puryear was objectively reasonable. We believe it was. At the time he signed the letter, Puryear was supervising Kaufman's team of caseworkers during the week of April 21, during which Kaufman was on vacation. (Puryear and Kaufman were at the same supervisory level.) He was confronted on Friday with a recommendation by Rodgers, one of Kaufman's caseworkers, that child abuse or neglect proceedings be commenced against Cecere. He was informed that Kristen was then residing with Brown, who had stated that her daughter was using drugs and was unable to care for the child. Brown had also expressed an apprehension that Cecere would return in an unstable state and demand that Kristen leave with her. Rodgers gave Puryear the draft letter and recommended to Puryear that he sign it. Puryear did so.
 
 
 15
 We believe that Puryear's belief that an emergency situation existed was objectively reasonable. His conduct must be assessed in light of his supervisory role. See United States v. International Bhd. of Teamsters, 931 F.2d 177, 187 (2d Cir.1991). Absent some indication to a supervisor that an investigation was inadequate or incompetent, supervisors are not obliged either to undertake de novo investigations or to cross examine subordinates reasonably believed to be competent as to whether their investigations were negligent. Puryear's affidavit states that Rodgers had a reputation as a competent and conscientious caseworker. Cecere has proffered no evidence to the contrary. Puryear was informed by Rodgers that a child had been entrusted by the mother to her grandmother who indicated that the child's mother was abusing drugs and could not care for the child. The caseworker also indicated that the grandmother had expressed apprehension that the mother would return for the child in an unstable state. Given Rodgers' reputation and his endorsement of Brown's fears, Puryear acted reasonably in signing the letter and freezing the status quo until proceedings were commenced.
 
 
 16
 Indeed, it is not entirely clear how events, or the legal consequences of those events, would have differed had Puryear made further inquiry. Had he done so, he would have learned that the pediatric nurse who had cared for Kristen since birth had filed a child abuse report, that Kaufman himself had investigated the report, that the child had spent much of her young life entrusted to relatives while Cecere abused drugs and alcohol, that Cecere had had severe emotional problems since her teenage years, including a very recent contemplation of suicide, that she had voluntarily turned Kristen over to Brown, and that there was strong evidence of serious neglect, such as the lack of food or clean clothing, and of imminent harm, such as presence during a suicide. None of this information, it seems to us, was likely to cause a reasonable supervisor to reject Rodgers' recommendation.
 
 
 17
 Indeed, had Puryear rejected Rodgers' recommendations and had the child then suffered some injury in the mother's care, he would have faced accusations that he had shut his eyes to serious indications of neglect based on statements by the grandmother and the primary health care provider and on the recommendation of an experienced and informed caseworker. Were we to hold that Puryear's actions were not objectively reasonable, we believe that supervisory officials might be put in the impossible situation of hindsight determining their liability.
 
 
 18
 Our decision in Duchesne v. Sugarman, 566 F.2d 817 (2d Cir.1977), is not to the contrary. In that case, the Bureau of Child Welfare took custody of children when the mother entered a psychiatric ward, notwithstanding the mother's refusal to grant consent. She had earlier dropped the children off at a neighbor's house, but the neighbor was either unwilling or unable to care for them. The child welfare authorities then retained custody of the children for some twenty-seven months, despite the mother's request for the return of the children and the lack of judicial ratification of the assertion of custodial authority. We held that the initial taking of custody was permissible because an emergency situation existed, but that the defendants were required to seek judicial ratification before asserting permanent custody.
 
 
 19
 In the instant case, however, the deprivation of custody by SSC officials was brief. Because Cecere had voluntarily left the child with Brown, the alleged constitutional deprivation is limited to the period between Brown's reliance upon the letter in refusing to turn Kristen over and Kaufman's instruction to Brown that the letter no longer had effect, perhaps a matter of minutes, at most four days. After that, SSC aided Cecere in her dispute with Brown. The facts of the instant case thus fall within Duchesne's explicit recognition that temporary assertions of custodial authority in the face of a reasonably perceived emergency do not violate due process. Id. at 826.
 
 
 20
 The judgment of the district court is therefore reversed.
 
 LUMBARD, Circuit Judge, dissenting:
 
 21
 Denial of a motion for summary judgment in a § 1983 action is appealable only to the extent that the appeal turns on a question of law. See Mitchell v. Forsyth, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985); Hurlman v. Rice, 927 F.2d 74 (2d Cir.1991); Mahoney v. Hankin, 844 F.2d 64 (2d Cir.1988). Because I cannot find as a matter of law that it was objectively reasonable for Puryear to believe that an emergency situation existed, I believe the appeal must be dismissed. Therefore I dissent.
 
 
 22
 The majority suggests that both Kaufman and then Rodgers had sufficient information to believe that emergency circumstances existed, and that Puryear was justified in relying on Rodgers' assessment. I do not find such information in the record.
 
 
 23
 According to the majority, Kaufman and Rodgers had reason to believe: that Cecere suffered from drug and alcohol dependency, as well as psychiatric and emotional problems and suicidal tendencies; that she regularly left Kristen with relatives for lengthy periods of time; that on one occasion she appeared drunk at her grandmother's home and demanded to have Kristen returned to her; that she rarely took Kristen to school; and that she had no money or food with which to feed Kristen.
 
 
 24
 There is no evidence that either Kaufman or Rodgers knew of these problems. Kaufman received an abuse report from a nurse practitioner at Montefiore Hospital. The report stated only that: "Mo[ther] has been abusing valium and alcohol for some time. In the past she would take child to Mat.-Great-Great-Gr. Mo. for care when she knew she would be using drugs and alcohol. Now Mo. is refusing to allow anyone to care for child (child absent from daycare). It is believed she is using drugs and alcohol and is unable to care for the child." The report contains no evidence of wrongdoing, merely the passive statement that "It is believed" Cecere cannot care for her daughter; this is nothing more than a warning of possible abuse which should be investigated.
 
 
 25
 Accordingly, Kaufman commenced an investigation of the allegations and visited Cecere and Kristen. He conducted a brief visual inspection, and stated that he would send a caseworker to investigate further. However, he found no evidence of abuse and neglect, and later testified that "I looked at the child and didn't see any bruises, didn't see a child that was dehydrated or ill fed. [I] did not see a mistreated child ... If it was other than that we would have removed her." Presumably Kaufman conveyed this finding to Rodgers, along with all the other information.
 
 
 26
 Rodgers never visited Cecere or Kristen. There is no evidence Rodgers knew anything about Cecere and Kristen other than Brown's broad allegations of neglect, the nurse's report of possible abuse, and Kaufman's actual findings of no abuse. I do not see how Rodgers was justified in finding that an emergency situation existed when his supervisor, who visited the child, had found to the contrary, and he himself had never met Kristen or Cecere.
 
 
 27
 Puryear had even less reason to suspect neglect than Kaufman or Rodgers. In his affidavit, his deposition, and again in his brief Puryear points to only three items which led him to believe that an emergency situation existed: Rodgers' conclusion that Kristen's welfare and safety would be endangered by returning her to her mother; Rodgers' statement that Brown believed that plaintiff was abusing drugs; and Rodgers' statement that Brown believed Cecere was unable to care for Kristen. These three factors surely cannot support invocation of the "emergency circumstances" exception, as they contain no concrete evidence of actual abuse or imminent danger to the child.
 
 
 28
 Nor is it clear that Puryear was justified in relying upon Rodgers' assessment. As the majority notes, a supervisor need not undertake de novo review or cross examine his subordinates "[a]bsent some indication ... that an investigation was inadequate." According to the record, a caseworker investigation should include an evaluation of the home environment of the child, a determination of the risk to the child if she remains at home, and a determination of the nature, extent, and cause of any condition enumerated in the report. It is clear from his report, however, that Rodgers did not comply with standard investigation requirements. He did not visit the home of the child, nor did he tell Puryear of Kaufman's visit. As far as Puryear knew, no one in the department had had any contact with the child. Furthermore, Rodgers identified no specific risk to Kristen should she remain at home, nor did he cite any evidence regarding the nature, extent, or cause of any alleged risks. In short, he provided no information other than that given to him by Brown. Reliance on the report of a caseworker who conducted an incomplete investigation, presented an insufficient report and never even saw the mother or the child cannot shield a supervisor from liability.
 
 
 29
 Finally, the majority suggests that events would not have differed had Puryear undertaken an independent investigation, as he probably would have accepted Rodgers' recommendation anyway. Yet Kaufman, the only individual to investigate the case and visit Kristen and Cecere, specifically found no evidence of abuse or neglect. In fact, three days after the alleged emergency, Kaufman returned from vacation and found insufficient evidence for a custody hearing, let alone an emergency situation. I cannot see why Puryear would have come to a different conclusion had he undertaken an independent investigation or questioned Rodgers' methods and findings.
 
 
 30
 In short, the record does not support the conclusion that, as a matter of law, it was objectively reasonable for Puryear to believe Kristen was in immediate danger of harm. Therefore, the appeal should be dismissed.