Catherine SUNDBYE, Plaintiff,

v.

Patrick OGUNLEYE, et al., Defendants.

No. 93–CV–1785 (JG).

United States District Court,
E.D. New York.

Feb. 3, 1998.

Bruce A. Young, Caryn J. Ashare, New York City, for Plaintiff.

Paul A. Crotty, Corp. Counsel of City of New York, New York City by Patricia B. Miller, for Defendants.

## MEMORANDUM AND ORDER

GLEESON, District Judge.

Catherine Sundbye brings this action pursuant to 42 U.S.C. § 1983,[1] claiming that defendants interfered with her parental rights in violation of her First, Fifth, Sixth and Fourteenth Amendment rights. Specifically, Sundbye contends that (1) defendants maliciously prosecuted her for complaining about the conduct of a New York City Child Welfare Administration caseworker, Patrick Ogunleye; (2) Ogunleye deprived her of her substantive due process rights by coercing her into signing a statement, which allegedly relinquished her custodial rights, and by making sexually harassing comments; and (3) defendants violated her procedural due process rights by removing her daughter from her custody without a hearing and in violation of New York State law. Plaintiff seeks compensatory and punitive damages and attorneys' fees. Defendants now move for summary judgment on all of plaintiff's claims. For the reasons set forth below, defendants' motion is granted in part and denied in part.

### FACTS

Catherine Sundbye ("Sundbye") is the mother of two daughters, Alexandria Sundbye, age fifteen, and Janel Negron, age eighteen. Sundbye lives with her two children in Brooklyn, New York.

Janel and Sundbye have a long history of discord and fighting. Although Sundbye denies that she ever hit Janel, Janel testified otherwise at her deposition. According to Janel, Sundbye has hit her on more than one occasion. After one incident, an employee at Janel's school called a child welfare agency because Janel was scared and didn't want to go home. As a result, she lived with her grandmother for two days. On another occasion, in September of 1990, Janel, while bleeding from her nose, told a security agent at her apartment building that her mother hit her. As a result of her injuries, Janel went to the hospital that evening.

On December 31, 1991, Sundbye, Janel and Alexandria went out to dinner with Sundbye's brother, John Sundbye, his friend (now his wife) Kathleen Kelly and several other family members. The group planned to return to Kelly's house after dinner in order to celebrate the new year together. Before they left the restaurant, however, Janel told Sundbye that she wanted to go home because she was menstruating. Sundbye responded that she had feminine products with her. Nevertheless, Janel insisted on going home and Sundbye agreed to accompany her.

After returning home, Sundbye and Janel got into an argument. Janel told Sundbye that she wanted to go to a party at a friend's house, but Sundbye did not want her to do so because she suspected that there would be no parental supervision at the party and Janel was too young to attend such a party. Janel then walked out of the apartment. Sundbye went to Kelly's house and remained there until after midnight.

When Janel returned home at approximately 10:00 A.M. the next morning, January 1, 1992, Sundbye was on the telephone with

---

1. 42 U.S.C. § 1983 provides, in pertinent part:
   Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Kelly. Kelly suggested that, in order to ease the tensions between Sundbye and Janel, Janel could live with her and John Sundbye for a short period of time. Sundbye agreed and immediately informed Janel that she would be "going to go stay with Uncle John." Sundbye Deposition at 36. Janel packed a bag with clothing, and John took her to his home later that day.

Although Sundbye never told Janel how long she would be staying at her uncle's, Sundbye contends that she anticipated that Janel would stay there only for a couple of days. Sundbye hoped that, during that time, she and Janel could attend counseling sessions together in order to assist them in resolving their conflicts.

On January 10, 1992, Patrick Ogunleye, a caseworker employed by the New York City Child Welfare Administration ("CWA"), went to plaintiff's home to investigate a report of child abuse and neglect (a "DSS–2221") filed that day on behalf of Janel by a staff member of Janel's school.[2] The allegation states, in relevant part:

Mom has been verbally and physically abusive to Jannell [sic] over the past several months, using her for housework and babysitting services. Mom becomes angry at Jannell who is half Puerto Rican[3] and mom is always throwing that fact in her face. Mom is prejudiced towards Puerto Ricans. Mom had been telling Jannell she wanted her out of the home by New Year's Day.... Jannell's been sent to live with grandmother, father, aunt all on mom's whim at the time. Mom recently tried to suffocate Jannell with a bookbag. Jannell says she can't take it anymore, she can't be shifted from relative to relative any longer. Mom's brother has Jannell now and Jannell is happy there and wishes to stay because she is emotionally drained due to mother's behavior. However, mom is

threatening to make Jannell come home again and Jannell does *not want* to go back in mother's care.

Defendants' Exhibit C (emphasis in original).[4]

Ogunleye and Sundbye present radically different accounts of what transpired during their meeting on January 10. I of course must accept plaintiff's version as true for purposes of this motion. She contends that Ogunleye, during that visit, talked very little about Janel and a great deal about personal matters, and that he made comments to her that she found intimidating, embarrassing and sexually harassing. Ogunleye also told Sundbye and Alexandria that if he "needed" to take Alexandria out of the house, he could do it. Sundbye Deposition at 78.[5]

According to Sundbye, Ogunleye asked her whether she was married, who she was married to and for details about her former husband. He also told her that he no longer wanted to have anything to do with his wife because she was "all used up" after having had several sexual encounters with other men. Ogunleye further told plaintiff about an incident in which two people in the back of the taxi cab he was driving asked him to slow down so they could have sex, and how a woman once offered him sex, but he refused because he was afraid that she would say that he raped her. Ogunleye told Sundbye that when a woman and a man first have sex, she should tell him how to do it "so he can get it right the following times after that." *Id.* at 71–72. Finally, Ogunleye told Sundbye, who weighs more than 200 pounds, that men from his country like large women. *Id.* at 70.

Sundbye made numerous oral complaints about Ogunleye's behavior to Anthony Lanza, Director of the Human Resources Administration's Brooklyn field offices, and to defen-

---

**2.** Plaintiff maintains that this visit took place on January 6, 1992. This discrepancy, however, does not bear upon any of the issues before me.

**3.** Janel's father, who lives in Pennsylvania, is Hispanic. Sundbye is white.

**4.** Ogunleye states that plaintiff admitted to the allegations of child abuse contained in the DSS–2221. Ogunleye Deposition at 84. Sundbye de-

nies ever having made such an admission, and she denies having attempted to suffocate her child. *See* Sundbye Deposition at 28.

**5.** Defendants contend that on or about January 14, 1992, a copy of the DSS–2221 report was mailed to plaintiff at her home. Sundbye, however, denies having received it.

dant Novella Anderson, Ogunleye's supervisor. Plaintiff claims that, in response to her complaints. Anderson "laughed in [her] face" and failed to take any action against Ogunleye. Sundbye Affidavit at ¶ 20.

After Janel left Sundbye's home, Sundbye frequently visited her at the home of John Sundbye and Kelly. She stopped doing so in the later half of January 1992, because, as she put it, "I just didn't feel that I wanted to. I wanted Janelle [sic] to come home, and I wanted to see Janelle away from them, outside of their home." Sundbye Deposition at 157–58.

On January 22, 1992, Ogunleye visited Janel at the home of John Sundbye and Kelly. While there, Janel confirmed to Ogunleye that her mother had assaulted her. Specifically, Janel told Ogunleye that she and her mother were fighting one day and

> she had my face pushed against the floor so I couldn't get up and there was a bag, my bookbag was on the floor and my face was pressed against the bag. She didn't try to choke me. I couldn't breathe because the bag and my nose was [sic] pressed against [the floor].[6]

*Id.* at 86–87. Janel stated to Ogunleye that she wanted to stay with her uncle for the "time being." *Id.* at 94.

That same day, following his visit with Janel, Ogunleye and John Sundbye went to plaintiff's home.[7] Plaintiff wrote and signed a letter stating:

> I, Catherine Sundbye agree to leave my daughter Janel Negron in the care of my brother John Sundbye and Kathleen Kelly his wife to be, until my daughter Janel and I can resolve our problems in therapy or counseling. For that period of time I agree to leave my daughter with my brother who resides at 1688 East 49th Street, Brooklyn, New York. I am voluntarily leaving my daughter there because of my

current situations. [Signed] Catherine Sundbye, 1/22/92.

Defendants' Exhibit F. Plaintiff contends that Ogunleye coerced her into signing the letter by (1) threatening to remove Alexandria from her custody; and (2) asserting his authority in such a way as to remind her of his prior sexually harassing conduct. Specifically, Sundbye states that Ogunleye said, "I'm not asking for any sexual favors, like I'm not asking, like he sort of generalized it. He didn't say it directly to me because my brother was there." Sundbye Deposition at 136. Sundbye further claims that she "felt like [she] was giving up [her] rights by writing this letter," Sundbye Deposition at 146, but she "agreed to sign it, and [she] regretted it later." Sundbye Deposition at 136.[8]

Sundbye claims that, at this January 22 meeting, she requested that (1) she and Janel be placed in family counseling sessions together; and (2) Janel return home with these services in place. According to Sundbye, Ogunleye refused this request. Plaintiff's Affidavit at ¶ 15.

On March 9, 1992, after having replaced Ogunleye with defendant Helen Nwameme as Sundbye's caseworker, CWA initiated a child abuse proceeding against Sundbye. On that day, Family Court Judge, Joseph A. Esquirol, ordered that Janel be placed in the custody of the Commissioner of Social Services pending further proceedings. Janel continued to live with her uncle.

In October 1992, Sundbye received a letter from the New York State Department of Social Services stating that the case against her was unfounded. On December 21, 1992, Sundbye, with the assistance of counsel, moved to dismiss the abuse petitions. On January 5, 1993, the motion was denied.

Thereafter, Janel was transferred from her uncle's home to a foster home. At that time, Janel indicated that she wanted to return to her mother's home at some point, but

---

**6.** Although Sundbye denies that this incident occurred, Sundbye Deposition at 28, there is no dispute as to what Janel told Ogunleye.

**7.** Plaintiff contends that this meeting took place on January 24, 1992. Again, the discrepancy in dates is irrelevant.

**8.** Sundbye's testimony on the issue is equivocal. She also stated that she did not take the letter "to mean anything," *id.* at 150, since she did not "have a good understanding of it at the time." *Id.* at 147.

not yet. Janel returned to Sundbye's home on February 16, 1993.

On March 30, 1993, the petitions filed against Sundbye were adjourned in contemplation of dismissal. On April 21, 1993, Sundbye commenced this action.

## DISCUSSION

### A. The Summary Judgment Standard

Summary judgment must be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining when material facts are in dispute, all ambiguities must be resolved and all inferences drawn in favor of the non-moving party. *Local 74, Serv. Employees Int'l Union v. Ecclesiastical Maintenance Servs.*, 55 F.3d 105, 108 (2d Cir.1995).

The initial burden is upon the moving party to demonstrate the absence of any genuine issues of material fact. *Gallo v. Prudential Residential Servs., Ltd.*, 22 F.3d 1219, 1223 (2d Cir.1994). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citations omitted). The non-moving party cannot survive a properly supported motion for summary judgment by resting on his pleadings "without 'any significant proba-

tive evidence tending to support the complaint.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 290, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)).

### B. The Malicious Prosecution Claim

Plaintiff claims that, in retaliation for her complaining about Ogunleye's conduct, defendants instituted "unfounded" child abuse proceedings against her. Although she couches this claim in First Amendment terms, plaintiff's essential allegation is that defendants maliciously prosecuted her.

The Second Circuit has consistently held that a claim for malicious prosecution under § 1983, requires the plaintiff to prove the elements of malicious prosecution under the tort law of the forum state, *see, e.g., Russell v. Smith*, 68 F.3d 33, 36 (2d Cir. 1995). However, it has not determined whether a civil proceeding, such as in a child abuse proceeding [9] can give rise to a cause of action under § 1983. In *Easton v. Sundram*, 947 F.2d 1011, 1017 (2d Cir.1991), the court stated: "We do not hold that civil malicious prosecution can never give rise to a cause of action under § 1983, although we suspect it normally will not." *Id.* 947 F.2d at 1018. In any event, one element that a plaintiff must establish to sustain either a criminal or a civil malicious prosecution claim under New York law is that the proceeding terminated in her favor. *See Russell*, 68 F.3d at 36 (favorable termination is an element of a criminal malicious prosecution claim); [10] *Realty By Frank Kay, Inc. v. Majestic Farms Supply, Ltd.*, 160 A.D.2d 789, 553 N.Y.S.2d 858, 859 (2d Dep't 1990) (favorable termination is an element of a civil malicious prosecution claim). [11]

---

9. Under New York State law, "a child abuse or neglect proceeding under article 10 of the Family Court Act is a civil proceeding for the protection of the child alleged to be abused or neglected." *People v. Smith*, 62 N.Y.2d 306, 476 N.Y.S.2d 797, 798, 465 N.E.2d 336 (1984).

10. Malicious criminal prosecution claims have four elements: "(1) the initiation or continuation of a criminal proceeding against the plaintiff; (2) termination of the proceeding in the plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a

motivation for the defendant's actions." *Russell*, 68 F.3d at 36.

11. Under New York State law, malicious civil prosecution claims have seven elements: (1) the commencement and prosecution of a judicial proceeding against the plaintiff, (2) by or at the insistence of the defendant, (3) without probable cause, (4) with malice, (5) which has terminated in favor of the plaintiff in the malicious prosecution action, (6) to her injury, and (7) that the plaintiff suffered interference with her person or property. *Realty By Frank Kay, Inc.*, 553 N.Y.S.2d at 859.

■ Here, it is undisputed that on March 30, 1993, the Article 10 Family Court proceeding against Sundbye was adjourned in contemplation of dismissal, Plaintiff's Affidavit ¶ 35, which does not constitute a termination in plaintiff's favor. *Murphy v. Lynn*, 118 F.3d 938, 949 (2d Cir.1997); *Roesch v. Otarola*, 980 F.2d 850, 852 (2d Cir.1992) (citing *Singleton v. City of New York*, 632 F.2d 185, 193–95 (2d Cir.1980), *cert. denied*, 450 U.S. 920, 101 S.Ct. 1368, 67 L.Ed.2d 347 (1981)). Accordingly, I grant defendants' motion for summary judgment with respect to plaintiff's malicious prosecution claim.

## C. The Substantive Due Process Claim

Plaintiff claims that Ogunleye's sexual harassment, beginning with his visit to her home on January 10, and his coercion surrounding the signing of the January 22 letter violated her substantive rights under the Due Process Clause of the Fourteenth Amendment.[12]

■ The Due Process Clause "was intended to prevent government 'from abusing [its] power, or employing it as an instrument of oppression.'" *DeShaney v. Winnebago County Dep't of Social Services*, 489 U.S. 189, 196, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) (quoting *Davidson v. Cannon*, 474 U.S. 344, 348, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986)). The substantive component of the Clause protects individuals from encroachments on their liberty by outrageous government actions, "regardless of the fairness of the procedures used to implement them." *Daniels v. Williams*, 474 U.S. 327, 331, 106 S.Ct. 677, 88 L.Ed.2d 662 (1986). The Supreme Court has cautioned, however, that it "has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this uncharted area are scarce and open-ended." *Collins v. City of Harker Heights*, 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992).

■ In order for a plaintiff to maintain a substantive due process claim, she must demonstrate that the government actor's ac-

tions were "arbitrary, or conscience-shocking, in a constitutional sense." *Id.* 503 U.S. at 128, 112 S.Ct. 1061. Substantive due process does not provide protection against state actions that are merely "'incorrect or ill-advised.'" *Lowrance v. Achtyl*, 20 F.3d 529, 537 (2d Cir.1994) (citation omitted). Therefore, most claims sounding in tort do not constitute substantive due process violations. Indeed, even intentional torts by government actors are not actionable as substantive due process violations unless they are "arbitrary and discriminatory" or "shock the conscience." *Interport Pilots Agency, Inc. v. Sammis*, 14 F.3d 133, 144 (2d Cir.1994).

■ Plaintiff alleges that Ogunleye made lewd remarks and coerced her into signing the January 22 letter by threatening that he had the authority to take Alexandria away from her. As both parties agreed at oral argument, since a credible report of child abuse with respect to Janel had been filed on January 10, 1992, Ogunleye's "threat" that he possessed the power to take Alexandria away from plaintiff was an accurate statement of his authority. In essence, then, plaintiff contends that Ogunleye's harassing comments violated her substantive due process rights. Putting aside the effect those comments could have had on the validity of the instrument she signed, a question not before me now, plaintiff has not alleged the type of oppression that gives rise to a substantive due process claim. *Compare Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952) (conduct of officers, who forcibly had suspect's stomach pumped, shocked the conscience) *and Riggins v. Nevada*, 504 U.S. 127, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992) (forced administration of psychotropic drugs violated substantive due process), *with Interport Pilots Agency, Inc. v. Sammis*, 14 F.3d 133 (2d Cir.1994) (agency's attempt to regulate harbor pilots, although erroneous, was not arbitrary or irrational). As the Second Circuit has explained in evaluating a malicious prosecution claim, "where a 'plaintiff has not been physically abused, detained, prosecuted due to racial or political motivation or otherwise deprived of equal protec-

---

**12.** The Due Process Clause of the Fourteenth Amendment provides, in relevant part, that no

state shall "deprive any person of life, liberty, or property, without due process of law."

tion of the law, courts are reluctant to find 'conscience-shocking' conduct that would implicate a constitutional violation.' " *Easton v. Sundram*, 947 F.2d 1011, 1018 (2d Cir.1991), *cert. denied*, 504 U.S. 911, 112 S.Ct. 1943, 118 L.Ed.2d 548 (1992) (quoting *Torres v. Superintendent of Police of Puerto Rico*, 893 F.2d 404, 410 (1st Cir.1990)). Though despicable, the inappropriate [13] remarks allegedly made by Ogunleye to plaintiff to not meet this stringent test. Accordingly, defendants' motion for summary judgment on plaintiff's substantive due process claim is granted.

### D. The Procedural Due Process Claims

Plaintiff claims that defendants illegally removed her daughter, Janel Negron, from her custody and control in violation of her procedural due process rights.[14] Defendants respond that (1) since defendants never "removed" Janel from plaintiff's custody, plaintiff has not been deprived of a liberty or property interest, and as such, has not suffered any constitutional injury; (2) the individual defendants are entitled to qualified immunity; and (3) plaintiff has offered no evidence that the City of New York maintains an unconstitutional policy or practice.

#### 1. The Plaintiff's Liberty Interest

The Fourteenth Amendment's guarantee of "due process of law" is applicable only where a state deprives an individual of a constitutionally protected "liberty" or "property" interest. *Board of Regents v. Roth*, 408 U.S. 564, 569, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). If no such interest is implicated, then no process is due the afflicted individual. *See id.* 408 U.S. at 569–70, 92 S.Ct. 2701. On the other hand, if the state deprives a person of a protected interest, the state must provide such procedures as the circumstances demand. *Mathews v. Eldridge*, 424 U.S. 319, 333–334, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (the fundamental requirement of due process is simply "the opportunity to be heard 'at a meaningful time and in a meaningful manner' ") (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965)).

Here, it is undisputed that natural parents, such as Sundbye, have a "fundamental liberty interest ... in the care, custody, and management of their child[, which] does not evaporate simply because they have not been model parents or have lost temporary custody of their child." *Santosky v. Kramer*, 455 U.S. 745, 753, 756, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (state must prove its allegation of parental unfitness by at least "clear and convincing" evidence in order to terminate parental rights); *see also Duchesne v. Sugarman*, 566 F.2d 817, 825 (2d Cir.1977) ("the most essential and basic aspect of familial privacy [is] the right of the family to remain together without the coercive interference of the awesome power of the state"). Therefore, the questions presented are (1) whether the actions of the defendants deprived plaintiff of her liberty interest in caring for her child; and (2) whether, if she was deprived of that interest, the state provided her with adequate post-deprivation process.

In her complaint, plaintiff alleges that defendants effectively removed Janel from her custody when Ogunleye and she first met, at which time he allegedly harassed her sexually and threatened to remove her other daughter, Alexandria, from her home. Plaintiff further alleges that the events oc-

---

**13.** Plaintiff asserted at one point in her deposition that although she considered Ogunleye's overtures to her inappropriate, she was not offended by them. Sundbye Deposition at 117.

**14.** Plaintiff also argues that she was denied her Sixth Amendment right to counsel when she was coerced to sign the January 22 letter without the benefit of a lawyer's advice. That claim is wholly without merit, since (1) Family Court proceedings are civil in nature, not criminal, *see United States v. Wade*, 388 U.S. 218, 227, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) (Sixth Amendment right to counsel attaches only at the "critical stage" of a criminal proceeding); and (2) the letter was signed before the onset of child abuse proceedings. *See Brewer v. Williams*, 430 U.S. 387, 398, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977) (quoting *Kirby v. Illinois*, 406 U.S. 682, 689, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972)) ("Whatever else it may mean, the right to counsel granted by the Sixth and Fourteenth Amendments means at least that a person is entitled to the help of a lawyer at or after the time that judicial proceedings have been initiated against him 'whether by way of formal charge, preliminary hearing, indictment, information, or arraignment' ").

curring at their second meeting, *i.e.,* the signing of the coerced statement and Ogunleye's verbal refusal to permit Janel to return home, furthered that deprivation. Plaintiff also contends that the almost two-month time period between the denial of her custodial rights and the institution of child abuse proceedings did not provide her with process within "a meaningful time." Although I reject plaintiff's argument that she was deprived of her parental rights on January 10, 1992, I find that there is a genuine issue of material fact as to whether she was unconstitutionally coerced into relinquishing certain of her custodial rights on January 22, 1992.

### a. *The Events of January 10, 1992*

▮▮ When Ogunleye visited plaintiff's home on January 10, 1992, Janel, at her mother's express direction, had already been residing at her uncle's home since January 1. Moreover, Sundbye did not, as of January 10, even subjectively believe that the state had interfered with her ability to bring Janel back into her home. As she stated in her deposition, Sundbye decided on her own to permit Janel to remain with John Sundbye and Kelly:

Q. As of January 6th, [Janel] was not back at your home; is that right?

A. Right.

Q. Why was she staying longer? Do you have any idea?

A. I wanted her to come home, and I think there was a vacation, and [Kelly] just said, you know, let her stay a little bit longer because the school is actually far from where we live ... I think maybe that was the reason she stayed there for a little bit longer.... I didn't have a problem if she wanted to stay there for a little bit longer period of time.

Sundbye Deposition at 62–63.

Plaintiff further testified that she readily visited Janel during this time period: "It was a vacation time, and I think I was definitely seeing her during that time with Alexandria." *Id.* at 63. Finally, Sundbye does not contend that Ogunleye, at their January 10 meeting,

prevented her by words or actions from bringing Janel back to her home.

### b. *The Events of January 22, 1992*

▮▮ According to Sundbye, she believed that, without understanding her rights or the import of her actions, she relinquished her custodial rights in the letter she signed under duress on January 22. This understanding was confirmed by Ogunleye when he refused Sundbye's request to permit Janel to return home. Indeed, not only did Sundbye allegedly believe that the agreement she signed on January 22 affected her custodial rights, but that was Ogunleye's intent in asking her to sign the document. According to Ogunleye, the reason he had her sign a letter rather than a voluntary placement form, which certainly would have temporarily extinguished certain parental rights, was that he did not "have any placement form with [him] at that time." Ogunleye Deposition at 185. In light of Ogunleye's and Sundbye's understanding of the January 22 agreement, there is a genuine issue of material fact as to whether Sundbye reasonably believed that she was deprived of her liberty interest in caring for Janel.

▮▮ Defendants suggest, however, that a plaintiff needs to be actually deprived, as a matter of state law, of a liberty interest in order to merit the procedural safeguards guaranteed by the Due Process Clause. Presumably, Sundbye could not meet this "actual deprivation" standard because the letter she signed was invalid and unenforceable under New York Social Services Law § 384–a(2)(c), which provides that a voluntary placement agreement altering a parent's custody rights must, among other requirements, state, "in lay terms, in conspicuous print of at least eighteen point type" that (1) the parent has the right to legal representation; (2) the parent has no obligation to transfer the care of her child; (3) the law permits the fixing of a date or an event upon which the child is to be returned or, if no date is set, the parent "has a right to the return of the child within twenty days of a request for return"; (4) the parent has the right to preventive and other supportive services; and (5) the parent has the right to a hearing.

I reject the suggestion that plaintiff must actually have been deprived of her liberty interest, and that her mere reasonable belief that such a deprivation had occurred is insufficient. In *Cecere v. City of New York*, 967 F.2d 826 (2d Cir.1992), the court confronted a similar issue.. In that case, on April 23, 1986, Gina Cecere voluntarily asked her mother, Elda Brown,. to care for her child, Kristen, in Brown's home. Two days later, after investigating allegations that Cecere had abused her child, a supervisor and an employee in the Bronx field office of the Office of Special Services for Children ("SSC") wrote a letter for the purpose of preventing Cecere from taking her child back until proceedings could be commenced in family court. The letter stated, in relevant part:

> To all Law Enforcement Agencies:
>
> This is to inform you that the Brown family is known to us. In lieu of pending court action; the child Kristen Hamlin is to remain with the maternal grandmother, Ms. Elda Brown....
>
> Please take due notice, that pending the results of court action, this child Kristen Hamlin, is not to be in the custody of her mother, Ms. Gina Brown [Cecere], under no circumstances!

Soon thereafter, Cecere contacted Brown and sought to see her child, but Brown refused that request in reliance on the SSC's letter. On or about April 29, 1986, the SSC decided not to bring child abuse proceedings against Cecere and informed Brown that "the April 25 letter did not constitute a grant of custody and no longer had any effect." *Id.* 967 F.2d at 828.

Cecere brought suit, alleging violations of her civil rights, based on the interference with her parental rights by Brown and employees of the SSC. The court initially determined that "we need not and do not endorse

the form of the letter." *Id.* at 829. Thus, the legal validity of the letter as a means of depriving Cecere of custody was apparently immaterial; since Brown operated under the assumption that the letter deprived Cecere of her custody rights, Cecere adequately alleged such a deprivation. However, because deprivation was brief and there were reasonable grounds to believe that an emergency condition threatening harm to the child existed, the supervisor at SSC who signed the letter was entitled to the defense of qualified immunity. *Id.* at 829–30.

■ Furthermore, it would defy common sense to permit a legal formalism of which a plaintiff could not have been aware, such as whether all of the requirements of New York Social Services Law § 384–a(2)(c) were met, to foreclose a § 1983 action, especially where all parties operated under the assumption that the plaintiff had been deprived of a fundamental liberty interest. It would be anomalous to conclude that the state, by enacting provisions of the Social Services Law to protect the rights of parents, achieved the opposite result by establishing a technical impediment to procedural due process claims. Ogunleye's failure to follow proper procedures under New York law should not immunize his unconstitutional conduct on the ground that the instrument signed by Sundbye was invalid.[15]

## 2. The Adequacy Of The Process Afforded Sundbye

■ Even accepting Sundbye's contention that she did not voluntarily consent to relinquish her custodial rights in the January 22 letter, the CWA, on its own, in light of Janel's statements to Ogunleye, arguably was justified in asserting control over Janel because of its obligation to protect her safety. *See Dietz v. Damas*, 932 F.Supp. 431,

---

**15.** Although "[f]ederal constitutional standards rather than state statutes define the requirements of procedural due process," *Robison v. Via*, 821 F.2d 913, 923 (2d Cir.1987), Ogunleye failed to comply with several provisions of state law. In addition to his multiple violations of the New York Social Services Law noted above, Ogunleye also failed to adhere to the requirements of the New York State Family Court Act (the "Act"), which requires, *inter alia*, that, when a child is

removed from her parent's custody with the written consent of that parent, either the child must be returned within three days or the child protective agency must file a petition that alleges facts "sufficient to establish that the return of the child to the care and custody of [her] parent ... would place the child in imminent danger of becoming an abused or neglected child." Act at §§ 1021 and 1031.

(E.D.N.Y.1996) ("[t]he law of this circuit, as well as other federal courts, is clear that, constitutionally, no prior hearing is required to remove a child from parental custody in an emergency situation"). Indeed, in cases of abuse, CWA employees are asked to perform a delicate balance:

> If they err in interrupting parental custody, they may be accused of infringing the parents' constitutional rights. If they err in not removing the child, they risk injury to the child and may be accused of infringing the child's rights.

*Van Emrik v. Chemung County Dep't of Social Services*, 911 F.2d 863, 866 (2d Cir. 1990). However, even where there are substantiated allegations of child abuse, which permit the removal of a child from her parents' care immediately and in the absence of a hearing, "the constitutional requirements of notice and an opportunity to be heard are not eliminated, but merely postponed." *Duchesne v. Sugarman*, 566 F.2d 817, 826 (2d Cir.1977). The Second Circuit has further provided that such a postponement must be short:

> [w]here there has been an emergency removal of a child from a parent's custody without a hearing, due process requires that the state procedures provide the parent an opportunity to be heard at a *reasonably prompt* time after the removal.

*Gottlieb v. County of Orange*, 84 F.3d 511, 520 (2d Cir.1996) (emphasis added). Under the facts alleged by plaintiff in this case, the six-week delay by the Child Welfare Administration in filing a family court petition of abuse was not even close to "reasonably prompt." *See Whisman v. Rinehart*, 119 F.3d 1303, 1310–1311 (8th Cir.1997) (even assuming defendants had a right to assert temporary custody over child, hearing held seventeen days after the assertion of custody was not sufficiently timely and thus did not provide the mother an adequate post-deprivation remedy).

In sum, plaintiff has alleged that her constitutional rights were violated on January 22, 1992, and thereafter, when she was deprived of her liberty interest in caring for Janel. I conclude that there are genuine issues of material fact requiring trial of that claim. Accordingly, I must consider (1) whether the defendants are entitled to the defense of qualified immunity; and (2) whether plaintiffs have alleged an unconstitutional policy or practice on behalf of the City of New York.

### 3. *Qualified Immunity*

The standard applicable to claims of qualified immunity is well-settled. "A government employee sued in her individual capacity for damages arising out of her performance of discretionary functions is entitled to qualified immunity where it was objectively reasonable to believe that her acts did not violate clearly established federally protected rights." *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir.1996). Here, there is no dispute that, at the time of the disputed actions, "it was clearly established that a parent's interest in the custody of a child was a constitutionally protected liberty interest subject to due process protection." *See Cecere v. City of New York*, 967 F.2d 826, 829 (2d Cir.1992). Therefore, the question is whether a rational jury could only conclude that it was objectively reasonable for each individual defendant to believe that his or her actions did not violate Sundbye's custody rights.[16] *See Gottlieb*, 84 F.3d at 518.

### a. *Ogunleye*

■ All of the wrongful acts alleged by Sundbye were performed by Ogunleye, who allegedly acted in disregard for the New York Social Services Law, the New York State Family Court Act and federal constitutional law. In short, if the plaintiff's factual assertions are proved at trial, a rational juror could readily conclude that it was not objectively reasonable for Ogunleye to coerce Sundbye into relinquishing custody of her child for a six-week period in the absence of any warnings or a hearing. Accordingly,

---

**16.** As plaintiff concedes, defendants Sabol, Little, Devlin and Macerious had neither personal knowledge of nor personal involvement in this case. Accordingly, summary judgment is granted with respect to plaintiff's claims against those defendants.

qualified immunity does not shield Ogunleye from § 1983 liability.

### b. *Nwameme*

There is no allegation that Nwameme was aware of Sundbye's contention that Ogunleye coerced her into relinquishing control of Janel. Nwameme did not do anything that interfered with Sundbye's custody rights, and she had no reason to believe that Ogunleye had. Indeed, after Nwameme was assigned to the investigation in March 1992, she attempted to have plaintiff sign a voluntary placement agreement. Had Nwameme believed that Janel was already in state custody, there would have been no reason to attempt to obtain this agreement.

Accordingly, I conclude that a rational jury could not fail to find Nwameme's actions objectively reasonable. She is therefore entitled to prevail on her defense of qualified immunity.

### c. *Anderson*

Plaintiff contends that Anderson is not entitled to qualified immunity because she failed adequately to supervise Ogunleye. However, "a defendant in a § 1983 action may not be held liable for damages for constitutional violations merely because [she] held a high position of authority." *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). Anderson can be held liable only if she participated in the unlawful activity or "directed the particular action alleged to have caused the deprivation of a constitutional right." *Kirsh v. City of New York,* No. 94 CIV. 8489, 1997 WL 375684, at *6 (S.D.N.Y. July 7, 1997). Accordingly, a defendant's "personal involvement" is "a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Personal involvement may be established through evidence of "direct participation, or failure to remedy the alleged wrong after learning of it, or creation of a policy or custom under which unconstitutional practices occurred, or gross negligence in managing subordinates." *Black,* 76 F.3d at 74.

Here, plaintiff's only allegation as to Anderson's "personal involvement" is that she failed to discipline Ogunleye for his many work-related deficiencies, which were documented in an extensive disciplinary complaint. There is no question, however, that after Sundbye brought her allegation that Ogunleye had sexually harassed her to Anderson's attention. Ogunleye was promptly dismissed as Sundbye's case worker. In addition, plaintiff does not address Anderson's management of other subordinates, aside from Ogunleye. Thus, plaintiff's allegations reduce to the unfounded contention that Anderson should be liable for the rogue actions undertaken by Ogunleye. Because there are no facts from which a rational jury could find the requisite personal involvement by Anderson in the tortious conduct, I conclude that Anderson is entitled to qualified immunity as a matter of law.

### E. *Municipal Liability*

In order to establish liability against the City of New York, plaintiff must show that the violation of her constitutional rights resulted from a municipal custom or policy. *Monell v. Dep't of Social Services,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Gottlieb v. County of Orange,* 84 F.3d 511, 518 (2d Cir.1996). Therefore, the first inquiry in any case alleging municipal liability under § 1983 is whether "there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). A policy or custom may also be established where a "municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction." *Gottlieb,* 84 F.3d at 518 (quoting *Ricciuti v. New York City Transit Authority,* 941 F.2d 119, 123 (2d Cir.1991)).

A municipality's deliberate indifference may be established where,

in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in a violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide

proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

*City of Canton*, 489 U.S. at 390, 109 S.Ct. 1197.[17]

■ Here, plaintiff alleges that the City of New York had a policy or practice of (1) removing children from their homes without informed consent; (2) filing child protective petitions in family court late or not at all; and (3) inadequately training and supervising workers with respect to their job-related duties. Plaintiff, however, has not offered any evidentiary support for these allegations. Indeed, plaintiff's counsel conceded at oral argument that he had not even sought discovery on any of these issues. *See* Transcript of Oral Argument held on August 1, 1997, at 26. Essentially, plaintiff argues that the 32–count disciplinary complaint filed against Ogunleye suffices to establish a municipal policy or custom. I disagree. Accordingly, I grant defendants' motion for summary judgment on plaintiff's claims against the City of New York.

### CONCLUSION

For the reasons stated above, defendants' motion for summary judgment on plaintiff's malicious prosecution, substantive due process and municipal liability claims is granted. I also grant summary judgment in favor of Nwameme and Anderson on their claims of qualified immunity. Finally, I deny defendant Ogunleye's motion for summary judgment with respect to the procedural due process claim asserted against him.

So Ordered.

---

**17.** The rationale for this stringent standard for establishing deliberate indifference was stated as follows:

> In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city "could have done" to prevent the unfortunate incident. Thus, permitting cases against cities for their "failure to train" employees to go forward under § 1983 on a lesser standard of fault would result in *de facto respondeat superior* liability on municipalities—a result we rejected in *Monell*, 436 U.S. at 693–694, 98 S.Ct. at 2037. It would also engage the federal courts in an endless exercise of second-guessing municipal employee-training programs. This is an exercise we believe the federal courts are ill suited to undertake, as well as one that would implicate serious questions of federalism.

*Id.* 489 U.S. at 392, 109 S.Ct. 1197.