KIA P., individually and on behalf of Mora P., an infant, and Mora P., Plaintiffs–Appellants,

v.

Rosemary McINTYRE, individually and as caseworker, Child Welfare Administration, Doran Delamothe, individually and as supervisor, Child Welfare Administration, Barbara Sabol, individually and as Commissioner of Social Services of the City of New York, Robert Little, individually and as Deputy Commissioner of Social Services of the City of New York, New York City, Defendants–Cross–Defendants–Appellees,

Long Island College Hospital and Susan Morance, Defendants–Cross–Claimants–Appellees.

Docket No. 98–9595.

United States Court of Appeals, Second Circuit.

Argued Sept. 14, 1999.

Decided Dec. 5, 2000.

Carolyn A. Kubitschek, Lansner & Kubitschek, New York, N.Y. (David J. Lansner, Lisa Napoli and Christopher S. Weddle, of counsel), for Plaintiffs–Appellants.

Susan Choi–Hausman, New York City Law Department, New York, N.Y. (Michael D. Hess, Corporation Counsel of the City of New York, Steven Friedman and Barry P. Schwartz, of counsel), for Defendants–Cross–Defendants–Appellees.

Jennifer Bienstock, Aaronson Rappaport Feinstein & Deutsch, New York, NY, for Defendants–Cross–Claimants–Appellees.

Bruce A. Young, New York, NY, filed a brief for Amicus Curiae the National Coalition for Child Protection Reform.

Nanette H. Schorr, Bronx Legal Services, Bronx, NY, filed a brief for Amicus Curiae Bronx Legal Services.

Before: FEINBERG, VAN GRAAFEILAND and SACK, Circuit Judges.

SACK, Circuit Judge:

This appeal arises from the withholding of a newborn infant from the custody of her parents on the basis of a toxicology test administered shortly after her birth that indicated the presence of methadone in her urine. The infant, plaintiff Mora P., was held by defendant Long Island College Hospital against the stated wishes of her mother for a total of ten days, during the first eight or nine of which the hospital was awaiting the results of a confirmatory urine test. As soon as results of a test showing that there was in fact no methadone in the infant's urine were received, the hospital medical staff gave her medical clearance to be discharged. She remained in the hospital for a day or two more, nonetheless, while a hospital social worker contacted the New York City Child Welfare Administration and received word from the agency that in its judgment the child should be discharged. She was thereupon released to her parents.

The child's mother, plaintiff Kia P., brought suit individually and on behalf of her infant daughter Mora alleging, *inter alia*, that the defendants infringed their constitutional rights in violation of 42 U.S.C. § 1983. The district court (Frederic Block, *Judge*) granted the defendants' motions for summary judgment and dismissed the plaintiffs' complaint in its entirety. *See Kia P. v. McIntyre*, 2 F.Supp.2d 281, 295–96 (E.D.N.Y.1998). The plaintiffs appealed the portions of the district court's judgment holding that: (1) the defendants did not violate the plaintiffs' substantive due process rights under the Fourteenth Amendment by unjustifiably infringing the plaintiffs' interests in family integrity; (2) the defendants did not violate the plaintiffs' procedural due process rights under the Fourteenth Amendment by removing Mora from the custody of her parents without a pre- or post-

deprivation hearing; (3) the defendants did not violate Mora's rights under the Fourth Amendment by conducting an unreasonable seizure; (4) the defendants did not violate the plaintiffs' equal protection rights under the Fourteenth Amendment by discriminating against the plaintiffs on the basis of Kia's HIV-positive status; and (5) certain of the individual defendants are protected by the doctrine of qualified immunity.

We affirm the judgment of the district court without reaching the issue of qualified immunity.

## BACKGROUND

On March 27, 1993, Kia P. went into labor. Believing it would be impossible to reach the North Central Bronx Hospital, where she had received prenatal care, in time, she went to Long Island College Hospital (the "Hospital") to give birth. The Hospital is privately owned and operated. When she was admitted, Kia disclosed that she had abused crack cocaine in the past, that she was HIV-positive, and that she had a history of tuberculosis and syphilis.

Later that day, Kia's daughter, Mora, was born. Kia's husband, Edwin P., accompanied Kia to the Hospital and was present for Mora's birth.

Because of Kia P.'s HIV-positive status and history of tuberculosis and the Hospital's belief that Kia had not received adequate prenatal care, in accordance with Hospital policy, the Hospital tested a sample of Mora P.'s urine for drugs shortly after her birth. On March 29, 1993, the Hospital's test indicated the presence of methadone in Mora's urine. That day, a Hospital social worker, defendant Susan Morance, who is a "mandated reporter," i.e., a person who, by the nature of her professional position, is required by New York state statute to make reports to the State of suspected abuse or maltreatment of children,[1] notified the New York State Central Registry for Child Abuse of the positive drug test. The Registry in turn notified the New York City Child Welfare Administration ("CWA").

Also on March 29, 1993, Kia P. was discharged from the Hospital. When she asked to take Mora home with her, Morance denied her request because, Morance told Kia, methadone had been detected in the baby's urine. According to Kia, Morance explained: "I have to talk to ... CWA," and, "Your daughter [has] a social hold on her. You will not be able to take her home. This is a case of CWA." Morance also allegedly stated that Kia could not stay in the Hospital with Mora, and that Kia would be forcibly ejected by Hospital security if she tried to stay. Kia was told, by her account, that she could "come in and see [her] daughter and feed her," but could not take her home.

There is no dispute that the Hospital had two reasons for retaining Mora. First, the Hospital's medical staff believed Mora had methadone in her bloodstream and was in danger of suffering from methadone withdrawal, a potentially fatal condition. As the district court noted, "there is undisputed evidence in the record that an infant's methadone withdrawal can take a minimum of one week to manifest itself. Hospital records indicate that Mora exhibited tremors and irritability, which are symptoms consistent with methadone withdrawal." *Kia P.*, 2 F.Supp.2d at 285. The second reason for holding Mora was the Hospital's compliance with Hospital and

---

1. N.Y.Soc.Servs.Law § 413 provides:

 The following persons and officials are required to report or cause a report to be made in accordance with this title when they have reasonable cause to suspect that a child coming before them in their professional or official capacity is an abused or maltreated child ...: any physician; registered physician assistant; surgeon; medical examiner; ... resident; intern; psychologist; registered nurse; hospital personnel engaged in the admission, examination, care or treatment of persons; ... social services worker; ... [or] mental health professional....

CWA policies requiring that any child under investigation by CWA not be released from the Hospital without CWA permission.

Either of these considerations could have resulted in the Hospital's retention of Mora. But from our review of the record on appeal we conclude as a matter of law that between the receipt of the results of the first test and Mora's ultimate medical clearance eight or nine days later, Mora was held by the Hospital for medical reasons, not concerns about possible parental mistreatment and CWA policies. It was the medical staff that made the initial decision to withhold Mora's release because of the danger of methadone withdrawal. And from Mora's birth to her medical release, the infant was under medical observation and care by the Hospital's medical staff.

Kia P. denied ever having used methadone, and she and her husband voluntarily submitted to drug tests, each of which yielded a negative result. Mora's urine sample, meanwhile, was sent by the Hospital to an outside laboratory, SmithKline Beecham, for confirmatory testing. Because of the small quantity of urine submitted to it, the laboratory was unable to perform the requested tests. The sample was therefore sent to a second outside laboratory, National Medical Services, for analysis by gas chromatography/mass spectrometry, a more sophisticated testing method. During this period, Hospital medical personnel monitored Mora for further symptoms of methadone withdrawal. Then, on April 6 or 7, 1993, the Hospital was informed by National Medical Services that its test indicated that there was no methadone in Mora's urine.

The same day, shortly after receipt of the gas chromatography/mass spectrometry test results, the Hospital's staff medically cleared Mora for discharge. Morance, made aware of this decision, then called defendant Rosemary McIntyre, the CWA caseworker assigned to the matter, and informed her of the medical clearance.

After McIntyre discussed the case with her supervisor, CWA decided that it would not seek custody of Mora. McIntyre then returned Morance's call, but was unable to reach her because she had left for the day. McIntyre successfully made contact with Morance the next day, April 8, 1993, and communicated to Morance CWA's conclusion that Mora could be discharged. Mora was released from the Hospital the same day, a day or two after the medical clearance had been given.

Neither CWA nor the Hospital ever discovered evidence of a danger of child abuse or neglect other than the initial test result and the Hospital medical staff's observations of the symptoms of methadone withdrawal in Mora. On June 5, 1993, the State Department of Social Services advised Kia P. that it had found "no credible evidence" that Mora had been abused or maltreated and that it considered the report of suspected child abuse or maltreatment to be "unfounded."

On February 16, 1994, Kia P., on behalf of her daughter and herself, brought this lawsuit in the United States District Court for the Eastern District of New York seeking damages and injunctive relief pursuant to 42 U.S.C. § 1983 and New York state law. The plaintiffs' complaint asserted seven causes of action: (1) that Mora was seized and removed from her parents' custody pursuant to Hospital and City policies in violation of the Fourth, Fifth and Fourteenth Amendments; (2) that the defendants conducted a "constitutionally inadequate" investigation because of inadequate training and supervision by the Hospital and the City; (3) that defendants Sabol, Little, McIntyre, Delamothe and the City (the "City defendants") violated New York state law by failing to provide services to preserve family integrity before removing Mora from her parents' custody, and by failing to reunite the family subsequent to Mora's removal; (4) that the defendants "unlawfully interfered with plaintiff's custody of her minor child"; (5) that the defendants unlawfully imprisoned Mora;

(6) that the defendants' investigation deviated from the standard of "reasonable care" as well as "accepted professional standards"; and (7) that the defendants discriminated against the plaintiffs because of Kia's HIV-positive status in violation of the Equal Protection Clause of the Fourteenth Amendment.

The defendants moved for summary judgment. The district court granted the motion, dismissing the complaint in its entirety. *See Kia P.,* 2 F.Supp.2d at 295–96.

The district court first determined that Morance and the Hospital (the "Hospital defendants") acted under color of law and were state actors for purposes of the claims under § 1983. The court reasoned that although the Hospital defendants did not engage in state action "insofar as [they] provided medical care to Mora during her hospitalization," they did engage in state action when they held Mora for nonmedical reasons pursuant to Hospital and CWA policies prohibiting the release of any child under CWA investigation without CWA permission. *See id.* at 288.

The district court next determined that the defendants did not infringe the plaintiffs' substantive due process rights under the Fourteenth Amendment. Applying the three-part test articulated by this Court in *Joyner v. Dumpson,* 712 F.2d 770, 777 (2d Cir.1983), the district court ascertained, first, that both Kia and Mora had a constitutionally protected fundamental right to family integrity. *See Kia P.,* 2 F.Supp.2d at 289. Second, the district court decided that this fundamental right was not " 'significantly infringed' " because Kia was permitted to visit with Mora during Mora's hospitalization, including her feeding times. *Id.* at 290 (quoting *Joyner,* 712 F.2d at 777). Third, the district court found that the defendants had "a reasonable basis to believe that Mora was in danger of abuse or neglect." *Id.* Weighing these three factors, the district court held that the defendants had not engaged in action "that is arbitrary, conscience-shocking, or oppressive in a constitutional sense." *Id.* at 2 (internal quotation marks omitted).

The district court also concluded that the defendants had not violated the plaintiffs' procedural due process rights under the Fourteenth Amendment. In the court's view, the initial test result indicating the presence of methadone in Mora's urine gave the defendants an adequate emergency basis for removing Mora from the custody of her parents without a pre-deprivation hearing. *See id.* at 291. The district court further held that there was no need for a post-deprivation hearing in light of (1) the low risk that the initial test result would be wrong and that the plaintiffs would, as a consequence, be erroneously deprived of their liberty interests, and (2) the minimal value that a post-deprivation hearing would have added while the confirmatory test-results were pending. *See id.*

Determining at the threshold that only Mora had standing to assert a Fourth Amendment claim, the district court rejected the argument that the testing of Mora's urine for purely medical reasons constituted a "search" within the meaning of the Fourth Amendment. *See id.* at 292. The plaintiffs do not appeal these determinations. The district court also held, however, that Mora was "seized" within the meaning of the Fourth Amendment when Kia was told that she was not free to take Mora home on March 29, 1993. Balancing the nature and quality of the intrusion on Mora's Fourth Amendment interests against the governmental interests at stake, the district court found that this seizure was "reasonable" and that Mora's Fourth Amendment rights therefore were not violated. *Id.* at 293.

The district court rejected in a more cursory fashion the plaintiffs' claimed right to an adequate child-abuse and neglect investigation. *See id.* This portion of the district court's judgment has not been appealed.

The district court also dismissed the plaintiffs' equal protection claim based on HIV discrimination because it was supported only by conclusory allegations. *See id.*

Finally, as to all constitutional violations, the district court concluded that the individual City defendants either were not personally involved in the events in question (defendants Sabol and Little) or were entitled to qualified immunity (defendants Delamothe and McIntyre). *See id.* at 294–95. The plaintiffs do not appeal the dismissal of the claims against Sabol and Little, but they do challenge the district court's determination of qualified immunity for Delamothe and McIntyre. The district court held that Morance, the only individual Hospital defendant, had waived the defense of qualified immunity by failing to plead it in her answer. *See id.* at 294 n. 5.

Because the district court had disposed of all federal claims, it exercised its discretion under 28 U.S.C. § 1367(c)(3) to dismiss the plaintiffs' state law claims. *See id.* at 296.

This appeal followed.

We now affirm the judgment of the district court but on the basis of a somewhat different analysis.

## DISCUSSION

### I. Standard of Review

We review the district court's grant of summary judgment *de novo*, construing the evidence in the light most favorable to the non-moving party. *See Tenenbaum v. Williams,* 193 F.3d 581, 593 (2d Cir.1999), *cert. denied,* 529 U.S. 1098 (2000). Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law," Fed.R.Civ.P. 56(c), i.e., "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). An issue of fact is "material" for these purposes if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

We may affirm the award of summary judgment on any ground with adequate support in the record. *See Name.Space, Inc. v. Network Solutions, Inc.,* 202 F.3d 573, 584 (2d Cir.2000); *Shumway v. United Parcel Serv., Inc.,* 118 F.3d 60, 63 (2d Cir.1997) ("It is beyond cavil that an appellate court may affirm the judgment of the district court on any ground appearing in the record.")

### II. State Action

"Section 1983 imposes liability on anyone who, under color of state law, deprives a person 'of any rights, privileges, or immunities secured by the Constitution and laws.' " *K & A Radiologic Tech. Servs., Inc. v. Commissioner of Dep't of Health,* 189 F.3d 273, 280 (2d Cir.1999) (quoting *Blessing v. Freestone,* 520 U.S. 329, 340, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997)). "[T]he core purpose of § 1983 is 'to provide compensatory relief to those deprived of their federal rights by state actors.' " *Hardy v. New York City Health & Hosps. Corp.,* 164 F.3d 789, 795 (2d Cir.1999) (quoting *Felder v. Casey,* 487 U.S. 131, 141, 108 S.Ct. 2302, 101 L.Ed.2d 123 (1988)). "Our first inquiry, therefore, is whether the actions alleged by the plaintiffs come within the definition of 'under color of' [state] law." *Carlos v. Santos,* 123 F.3d 61, 65 (2d Cir.1997) (quoting 42 U.S.C. § 1983).

■ "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Id.* (quoting, *inter alia, West*

*v. Atkins,* 487 U.S. 42, 49, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988)) (other citations and internal quotation marks omitted). The Hospital is owned and administered by a private corporation; it is not a state or municipal facility. The district court held, *see Kia P.,* 2 F.Supp.2d at 288, the parties do not dispute, and we agree that insofar as the Hospital and its employees rendered medical care to Kia P. and her newborn daughter, the Hospital was therefore not a state actor. *See Blum v. Yaretsky,* 457 U.S. 991, 1011, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982) (holding that "decisions made in the day-to-day administration of a nursing home" do not constitute state action). Whatever misdeeds the Hospital defendants may have committed in providing that care—if any there were—they are not redressable under § 1983.

## A. The Hospital's Failure to Release Mora Prior to April 7

■ Mora P. was born on March 27, 1993. Her urine tested positive for methadone and hospital doctors observed in her behavior symptoms of methadone withdrawal, including irritability and tremors. Because methadone withdrawal in an infant is a serious, sometimes fatal condition, the Hospital retained Mora for observation and treatment after it released her mother. Following a second attempt to confirm the test results using a sophisticated testing procedure, the first attempt having been inconclusive, the Hospital learned on April 6 or April 7 that the positive result of the Hospital's test for methadone had been in error. As a result of the laboratory report combined with the child's apparent good health some two weeks after her birth, she was given medical clearance for discharge. It was only after the medical clearance that the medical staff told Morance, the responsible Hospital social worker, that Mora was medically ready to leave the Hospital. These actions—testing Mora's urine for methadone, holding and treating Mora for methadone withdrawal, and medically clearing Mora after the negative confirmatory test—were taken by the Hospital in its capacity as a private provider of medical care and thus do not subject the Hospital to liability under § 1983.[2]

■ In addition to having a relationship with each of Kia P. and Mora P. as a provider of medical care, the hospital had a discrete and distinguishable role in the complex relationship among the State, the parent and the child in determining the safety and propriety of releasing Mora P. to the care of her mother. In the latter capacity, the Hospital defendants were required by statute to report the birth of Mora P., who initially tested positive for methadone and whose mother had a history of drug addiction, because it raised the specter of potential child abuse or neglect. There is evidence from which a jury could conclude that in addition to the Hospital's medical decision not to issue a release until April 6 or 7 pursuant to its medical relationship with Mora, it also put a hold on her release in its social welfare role because of its concern about her care in the hands of her mother. As the district court correctly found, insofar as the Hospital was acting in the latter capacity—as part of the reporting and enforcement machinery for CWA, a government agency charged with detection and prevention of child abuse and neglect-the Hospital *was* a state actor.

**2.** There is insufficient evidence in the record to support a finding that the Hospital's decision to hold Mora until she was medically cleared was made for CWA-related purposes and therefore constituted government action. Some evidence suggests that if the Hospital does not have concerns relating to the ability of a parent properly to care for an infant, there may be circumstances when, at least absent further action by the Hospital, that parent may take the child home despite "medical advice" to the contrary. That does not establish that absent CWA-related concerns, Mora would have been released to her mother at her mother's insistence despite Hospital doctors' concerns that Mora might be suffering from life-threatening methadone withdrawal. Such evidence thus does not establish state action by the hospital in retaining Mora pending her medical release.

[C]onduct that is formally "private" may become so entwined with governmental policies or so impregnated with a governmental character as to become subject to the constitutional limitations placed upon state action.... In certain instances the actions of private entities may be considered to be infused with "state action" if those private parties are performing a function public or governmental in nature and which would have to be performed by the Government but for the activities of the private parties.

*Perez v. Sugarman,* 499 F.2d 761, 764–65 (2d Cir.1974) (quoting *Evans v. Newton,* 382 U.S. 296, 299, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966)) (internal quotation marks omitted). But the refusal of the Hospital to release Mora to her mother for reasons relating to child abuse and child welfare laws did not become effective until the medical release was issued and Mora was no longer being held by the Hospital's doctors for treatment and observation, i.e., on April 6 or April 7.

We conclude, therefore, that the Hospital's actions in its capacity as a state actor had no effect, and thus did not subject it to liability under § 1983, for the period between Mora's birth and her medical clearance. The plaintiffs' due process claim turns on whether the Hospital, acting in its role as an instrumentality of the government by holding Mora as part of the State's effort to detect and prevent child abuse, deprived Kia P. or her daughter of liberty without due process of law. The Hospital, treating Mora P. as its medical patient, did not declare her ready for release until April 6 or 7. Therefore, from the date of Mora's birth to April 6 or 7,

whatever liberty interest Kia P. and Mora P. possessed was being denied by the Hospital as a private actor providing medical care. The Hospital in its role as state actor during that period of time was incapable of depriving, and therefore did not deprive, mother and daughter of liberties that had already been taken away by the Hospital's medical staff as private, professional persons.[3]

**B. The Hospital's Failure to Release Mora between April 6 or 7 and April 8**

Between Mora P.'s medical clearance on April 6 or 7 and her discharge to her mother's care on April 8, Mora was being held by the Hospital solely pending action by the CWA. The Hospital defendants were therefore behaving as state actors and may be held accountable under § 1983 for events occurring during that period. Our conclusions with respect to state action necessarily limit our analysis of the alleged constitutional violations to the Hospital's actions after Mora's medical clearance on April 6 or April 7.

**III. Due Process**

*A. Substantive Due Process.*

■ Mora P.'s claim based on her detention at the Hospital "must be analyzed under the standard appropriate to [the Fourth Amendment], not under the rubric of substantive due process." *Tenenbaum,* 193 F.3d at 600 (quoting *United States v. Lanier,* 520 U.S. 259, 272 n. 7, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997)) (alteration in original). "[W]here another provision of the Constitution 'provides an explicit tex-

---

**3.** Our decision in this case turns in large part on our conclusion that the Hospital was not a state actor when it provided medical care to Mora. We need not address whether the Constitution prohibits a state-owned hospital from holding a child for medical reasons against a parent's wishes. Neither we nor the Supreme Court have heretofore marked the boundaries of a parent's right to control the medical treatment of his or her child, or a medical provider's ability to override a par-

ent's medical decision. *See Defore v. Premore,* 86 F.3d 48, 50 (2d Cir.1996) (declining to resolve these issues); *van Emrik v. Chemung County Department of Social Services,* 911 F.2d 863, 867 (2d Cir.1990) (recognizing in dictum parents' constitutional liberty interest in having "a significant decision-making role concerning medical procedures sought to be undertaken by state authority upon their children").

tual source of constitutional protection,' a court must assess a plaintiff's claims under that explicit provision and 'not the more generalized notion of "substantive due process." ' " *Conn v. Gabbert*, 526 U.S. 286, 293, 119 S.Ct. 1292, 143 L.Ed.2d 399 (1999) (quoting *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). We therefore analyze Mora's detention claim under the Fourth Amendment in Part IV below.

But, like the parental plaintiffs in *Tenenbaum*, Kia P. "do[es] not have—or at least no longer allege[s]—cognizable Fourth Amendment claims based on [her daughter's] :... removal." *Tenenbaum*, 193 F.3d at 600. Because Kia P.'s claims cannot be analyzed under any other more specific constitutional provision, we must assess them in terms of the Fourteenth Amendment's substantive due-process guarantee.

"For all its consequence, 'due process' has never been, and perhaps never can be, precisely defined." *Lassiter v. Department of Social Servs.*, 452 U.S. 18, 24, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981). However, "[s]ince the time of our early explanations of due process, we have understood the core of the concept to be protection against arbitrary [government] action." *County of Sacramento v. Lewis*, 523 U.S. 833, 845, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998); *see also Tenenbaum*, 193 F.3d at 600 ("Substantive due-process rights guard against the government's 'exercise of power without any reasonable justification in the service of a legitimate governmental objective.' ") (quoting *County of Sacramento*, 523 U.S. at 846, 118 S.Ct. 1708).

■■■■ The substantive due-process guarantee also "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 720, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997). We have described the interest of a parent in the custody of his or her children as "a fundamental, constitutionally protected liberty interest." *Gottlieb v.*

*County of Orange*, 84 F.3d 511, 518 (2d Cir.1996); *see also Tenenbaum*, 193 F.3d at 600 (observing that a family has, "in general terms, a substantive right under the Due Process Clause 'to remain together without the coercive interference of the awesome power of the state' ") (quoting *Duchesne v. Sugarman*, 566 F.2d 817, 825 (2d Cir.1977)); *Wilkinson v. Russell*, 182 F.3d 89, 103 (2d Cir.1999) ("It has long been settled in this Circuit 'that a parent's interest in the custody of a child [is] a constitutionally protected liberty interest subject to due process protection.' ") (quoting *Cecere v. City of New York*, 967 F.2d 826, 829 (2d Cir.1992)) (alteration in original); *Duchesne*, 566 F.2d at 825 (describing right of family to remain together as "the most essential and basic aspect of family privacy").

No matter how important the right to family integrity, it does not automatically override the sometimes competing "compelling governmental interest in the protection of minor children, particularly in circumstances where the protection is considered necessary as against the parents themselves." *Wilkinson*, 182 F.3d at 104 (internal quotation marks omitted). As we said in *van Emrik v. Chemung County Department of Social Services*, 911 F.2d 863, 866 (2d Cir.1990):

> Though a decision to remove a child from parental custody implicates the constitutional rights of the parents, it obliges protective services caseworkers to choose between difficult alternatives in the context of suspected child abuse. If they err in interrupting parental custody, they may be accused of infringing the parents' constitutional rights. If they err in not removing the child, they risk injury to the child and may be accused of infringing the child's rights.

Recognizing the need for "unusual deference in the abuse investigation context," we have held that an investigation will "pass[ ] constitutional muster provided simply that case workers have a 'reason-

able basis' for their findings of abuse." *Wilkinson*, 182 F.3d at 104 (quoting *van Emrik*, 911 F.2d at 866).

■ Because of our holding regarding state action, the Hospital did not hold Mora in its capacity as a state actor until *after* the primary evidence of abuse had been discredited, when the drug test indicated the absence of methadone in Mora's urine and she was medically cleared for release. We conclude, however, that the Hospital's decision to hold Mora thereafter while it informed CWA of the test result and waited for a response was a decision not without a "reasonable basis," *Wilkinson*, 182 F.3d at 104, or "without any reasonable justification in the service of a legitimate governmental objective," *Tenenbaum*, 193 F.3d at 600 (quoting *County of Sacramento*, 523 U.S. at 846, 118 S.Ct. 1708). We think the Constitution allows the CWA a short time—a day or two in this case—to process the new information provided by the test results, to review Mora's case in light of this new information, to decide whether to authorize Mora's release, and to communicate its decision to the Hospital. The Hospital's holding of Mora pending the outcome of this deliberative process is a reasonable accommodation of the state's compelling interest in protecting children from abuse and neglect. As a matter of law, Kia P.'s rights to substantive due process were not abridged.

*B. Procedural Due Process.*

■ For purposes of procedural due process analysis, parents have "a constitutionally protected liberty interest in the care, custody and management of their children," *Tenenbaum*, 193 F.3d at 593 (citing cases), and children have a parallel constitutionally protected liberty interest in "not being dislocated from the 'emotional attachments that derive from the intimacy of daily [family] association,' " *Duchesne*, 566 F.2d at 825 (quoting *Smith v. Organization of Foster Families for Equality & Reform*, 431 U.S. 816, 844, 97

S.Ct. 2094, 53 L.Ed.2d 14 (1977)). The State also has "a profound interest in the welfare of the child." *Tenenbaum*, 193 F.3d at 593–94. The question then is: What procedures must be afforded to a parent when the coercive power of the State seeks to separate them?

The Supreme Court has indicated that the answer generally depends on three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *accord, e.g., Zinermon v. Burch*, 494 U.S. 113, 127, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). "[P]rocedural due process rules are shaped by the risk of error inherent in the truthfinding process as applied to the generality of cases." *Mathews v. Eldridge*, 424 U.S. at 344, 96 S.Ct. 893; *accord Walters v. National Ass'n of Radiation Survivors*, 473 U.S. 305, 321, 105 S.Ct. 3180, 87 L.Ed.2d 220 (1985); *Santosky v. Kramer*, 455 U.S. 745, 757, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *Mackey v. Montrym*, 443 U.S. 1, 14, 99 S.Ct. 2612, 61 L.Ed.2d 321 (1979); *Parham v. J.R.*, 442 U.S. 584, 612–13, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979). In other words, the requirement of a hearing or other procedural safeguard typically will not depend on the quantum of evidence possessed by the government in any one particular case.

This Court, in a substantial line of cases, has addressed the standards by which a state actor is measured for due process purposes when he or she removes a child from a parent's custody in the interests of the safety of the child. *See, e.g., Tenenbaum*, 193 F.3d at 593–95, and cases cited

therein. But the situation of Kia P. and her daughter was different. Mora was not taken from Kia. Kia placed her child in the care of a non-governmental actor for medical care when she gained admission to the Hospital and gave birth there. It was while Mora was under that care, after she had been medically cleared, that the Hospital defendants, acting for the State, held her for an additional day or two while it sought CWA advice as to her release.

■ Kia P.'s claims are therefore covered by a subset of our cases addressing circumstances where the government, although not physically taking the child away from a parent, gains custody of the child by refusing to release him or her after the parent has voluntarily granted temporary custody to the government or a third party. Such situations unquestionably also implicate the parent and child's procedural due process rights. *See Cecere*, 967 F.2d at 830 (holding that when parent voluntarily leaves child with third party, and third party later refuses to return child to parent on basis of State authority, parent is deprived of constitutionally protected liberty interest in custody of her child at moment of refusal to return that child); *Duchesne*, 566 F.2d at 822–23, 828 (holding that even though mother voluntarily left children with neighbor, when State officials assumed custody of children from neighbor and refused to return children to mother, such officials were required to initiate post-deprivation proceeding); *cf. Joyner*, 712 F.2d at 782–83 (holding that parents who voluntarily relinquished children to State nonetheless possessed substantive due process rights with respect to State's later refusal to return children and State's practice of "strictly controlling visitation, thereby isolating the child and straining familial bonds").

The rule in this Circuit is that under these circumstances the State has the duty to initiate a "prompt" post-deprivation hearing after the child has been removed from the custody of his or her parents. *See Gottlieb*, 84 F.3d at 520.[4] In other words, "in those 'extraordinary' situations, where deprivation of a protected interest is permitted without prior process, the constitutional requirements of notice and opportunity to be heard are not eliminated but merely postponed." *Duchesne*, 566 F.2d at 826 (quoting *Boddie v. Connecticut*, 401 U.S. 371, 379, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971)). Because, among other things, the state actor ordinarily "has a far greater familiarity with the legal procedures available for testing its action," "[t]he burden of initiating judicial review must be shouldered by the government," *id.* at 828. We must therefore resolve whether the plaintiffs were denied a "prompt" post-deprivation hearing in this case.

■ We hold that as a matter of law they were not. Shortly after Mora was cleared medically by the Hospital's staff, Morance called McIntyre, the CWA caseworker, and reported the clearance. McIntyre discussed the case with her supervisor who, in consultation with McIntyre, decided to give the Hospital permission to release Mora to her parents. McIntyre then returned Morance's call. Unable to reach her that day, McIntyre successfully made contact with Morance the following day, April 8, 1993. McIntyre told Morance that as far as CWA was concerned, Mora could be discharged. Mora was released from the Hospital the same day, a day or two after the medical clearance had been given. Failure of the Hospital defendants to obtain a hearing during that short period did not violate the rule that a hearing be held promptly, especially in light of the fact that the time was

4. A pre-deprivation hearing, which is required in non-emergency situations, *see Tenenbaum*, 193 F.3d at 594, would have been extremely impractical in this case, because the Hospital already had custody of Mora at the moment she was medically cleared. At that point, the Hospital's custody of Mora became state action and a pre-deprivation hearing was no longer possible.

used by the CWA to decide promptly whether to release Mora after it received news of the drug test showing an absence of methadone.[5] In *Cecere* we held that certain emergency conditions permitted the deprivation of a parent's custody of her child over a four-day period including a weekend and two weekdays. *See Cecere,* 967 F.2d at 830. In other words, we held that emergency circumstances justified an immediate removal of the child from her parent, and that a four-day delay without a post-deprivation hearing was constitutionally permissible. *Cecere* differs from the case at bar inasmuch as the child in *Cecere* was separated from her mother because of evidence of abuse. It nonetheless indicates the amount of breathing room that we think the law allows child welfare officials to permit them to determine what action should be taken after parent and child have been separated.

We underscore what should be plain from the foregoing discussion: Had Kia P. been held by the Hospital solely for purposes of protecting the child from possible abuse or improper parental care for the entire ten days during which parent and child were kept apart, without a hearing and a court order permitting their enforced separation, there is a serious danger that the Hospital defendants would have violated the plaintiffs' procedural due process rights. As a state actor under those circumstances, the Hospital defendants could have been held liable to the plaintiffs under § 1983 for any such violation.

Finally, we note that there is no evidence that CWA or any of its employees proximately caused Mora to be kept from her parents without a hearing. No CWA employee ever directed the Hospital to hold Mora against her parents' wishes pending the CWA investigation. And while the CWA had a policy prohibiting hospitals from releasing children under CWA investigation without CWA permission, there is no evidence that Mora was detained pursuant to that policy. Because there is no genuine issue of material fact as to whether the City defendants proximately caused the alleged violation of the plaintiffs' procedural due process rights to a prompt post-deprivation hearing, those defendants would be entitled to summary judgment in any event. *See Gierlinger v. Gleason,* 160 F.3d 858, 872 (2d Cir.1998) ("[I]n all § 1983 cases, the plaintiff must prove that the defendant's action was a proximate cause of the plaintiff's injury.").

## IV. Fourth Amendment

 With respect to the plaintiffs' claim under the Fourth Amendment, as applied to the States under the Fourteenth Amendment, the district court held that only Mora, and not her mother, had standing to assert a claim, that Mora was not "searched" within the meaning of the Fourth Amendment when the Hospital ex-

5. We note, as did the plaintiffs in their principal brief on appeal, that under New York state law a hospital may detain an infant without court order until the next weekday. *See* N.Y. Social Servs. Law § 417(2) (stating that when hospital holds child for emergency reasons, it should notify local child protective service, which in turn shall initiate a child protective proceeding in the family court "at the next regular weekday session" if it wishes to retain custody of the child); N.Y. Family Court Act § 1024(a) (permitting temporary deprivation of custody without court authorization only if "there is not enough time to apply for an order"); N.Y.Comp.Codes R. & Regs. tit. 18, § 432(*o*) ("Upon notification that a child is retained in protective custody, the child protective service shall commence a proceeding at the next regular weekday session of the appropriate Family Court, or recommend to the court at that time that the child be returned to his parents or guardian."); Memorandum of 6/3/91 from Robert L. Little, Executive Deputy Commissioner of CWA, and Barry Ensminger, General Counsel, Office of Legal Affairs, to all CWA and Office of Legal Affairs staff, at 2 ("Holds of children in the hospital directed by CWA staff are the equivalent of emergency removals. No such removals may continue more than 24 hours (or until the next regular court day) without court authorization."); CWA, Child Protective Services Field Operations Manual issued 12/15/91, ch. 6, at 3 ("[T]he caseworker must go to Family Court within 24 hours or the next working day to file a petition.").

amined her urine, and that Mora was not subject to an unreasonable "seizure" in violation of the Fourth Amendment when she was kept from her parents' custody. *See Kia P.,* 2 F.Supp.2d at 292–93. The plaintiffs appeal only the last of these determinations.[6]

**The Fourth Amendment states:**

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. We have observed that the Fourth Amendment applies in the context of the seizure of a child by a government-agency official during a civil child-abuse or maltreatment investigation. *See Tenenbaum,* 193 F.3d at 602. And there is no doubt that Mora's retention by the Hospital was a "seizure" within the meaning of the Fourth Amendment. A "seizure" occurs where, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (plurality opinion of Stewart, J.); *accord Michigan v. Chesternut,* 486 U.S. 567, 573, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988). Although the usual phrasing of the seizure test is difficult to apply here—Mora P. is unlikely to have had a "belief" as to whether or not she was free to leave the Hospital—Kia P. was told in no uncertain terms that she could not take Mora home from the Hospital. It was clear to Kia P., if not to Mora, that Mora was not free to leave. Because of our conclusion that the Hospital was not a state actor until Mora was medically cleared on April 6 or 7, however, Mora's § 1983 claim implicates the actions of the Hospital only after Mora's medical clearance. Mora was therefore "seized" within the meaning of the Fourth Amendment only after she was medically cleared but not released from the Hospital's custody.

In *Tenenbaum,* we declined to decide which of three modes of determining whether a seizure was "reasonable" under the Fourth Amendment should apply in cases where the state seizes a child in order to prevent abuse or neglect. Whether such a seizure requires probable cause, or whether it is subject to a "less stringent reasonableness requirement" due to the "special needs" of child protection agencies, or whether a seizure must be justified by "exigent circumstances" was unnecessary to our decision because all three analyses supported our holding that a jury could have concluded that the seizure in that case was unconstitutional. *Tenenbaum,* 193 F.3d at 603–05. We need not and therefore do not address the issue in this case either.

The seizure in this case is unusual because the Hospital had physical custody of Mora both before and after the seizure. It occurred when the perceived danger of harm to Mora from her medical condition ended. Custody then passed from the Hospital as private actor to the Hospital as state actor, as it continued to hold her briefly to determine whether any action should be taken with respect to possible danger of parental abuse. We conclude, for substantially the same reasons that militate against our finding of a due process violation, that the Hospital's short-term custody of Mora pending its report of the negative drug-test result and medical clearance to CWA and CWA's subsequent deliberation about whether to hold Mora

---

**6.** They also argue that Mora was entitled under the Fourth Amendment to a post-seizure hearing. Because the plaintiffs did not raise this issue below, we decline to consider it. *See Greene v. United States,* 13 F.3d 577, 586 (2d Cir.1994) (noting general rule that issues may not be raised for first time on appeal, and that choice to invoke one of the exceptions to this general rule "is discretionary with the panel hearing the appeal").

was reasonable. Indeed, it would have put the Hospital defendants in an impossible position to have required them to decide whether further action and its attendant legal proceedings were advisable without allowing them some time in which to make that decision. Because the Hospital defendants' brief seizure of Mora P. while they were state actors was "reasonable," it did not violate the Fourth Amendment.

The district court properly granted summary judgment on the plaintiffs' Fourth Amendment claim.

### V. HIV Discrimination

The district court dismissed the plaintiffs' claims of HIV discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment on the ground that the plaintiffs had offered only conclusory allegations that the defendants' actions had "anything to do with" Kia's HIV-positive status. *Kia P.*, 2 F.Supp.2d at 293. On appeal, the plaintiffs dispute this characterization of the evidence.

While the plaintiffs describe a litany of disturbing events, all but one of them arose exclusively from the Hospital's medical treatment of Kia P. and her daughter. The Hospital was neither engaged in state action nor acting under color of law when it performed those acts. Thus, no defendant, including the Hospital defendants, may be held liable under § 1983 for alleged discrimination arising out of the plaintiffs' medical treatment at the Hospital.

All that remains is the plaintiffs' claim that the Hospital refused to release Mora because Kia P. was HIV-positive. She has offered no evidence from which a reasonable trier of fact could infer that this was the reason for the Hospital's actions. A plaintiff may not survive a properly asserted motion for summary judgment on the basis of conclusory allegations alone. *See Finnegan v. Board of Educ.*, 30 F.3d 273, 274 (2d Cir.1994).

We therefore affirm the grant of summary judgment on the plaintiffs' equal protection claim.

### CONCLUSION

For the reasons set forth above, we affirm the judgment of the district court.

VAN GRAAFEILAND, Senior Circuit Judge,

I concur in the result.