Elaine **BARSTOW**

v.

Pamela **SHEA**

**No. 3:00CV2141(JBA).**

United States District Court, D. Connecticut.

Feb. 21, 2002.

**MEMORANDUM OF DECISION [# 23]**

ARTERTON, District Judge.

On May 3, 1999, while suffering from a severe bout of poison ivy, plaintiff Elaine Barstow, a Correctional Head Nurse employed by the University of Connecticut Managed Health Care, was allegedly prevented from leaving work at the Osborn Correctional Center by her supervisor, defendant Pamela Shea. Plaintiff claims to have been "held hostage" by Ms. Shea for several hours, and to have suffered severe physical and emotional distress as a result, that eventually necessitated her taking an extended medical leave from May 18, 1999 to February 2000. Plaintiff asserts that she was subjected to an unlawful seizure and was denied equal protection of the laws, all in violation of 28 U.S.C. § 1983, and also alleges state law claims of false imprisonment, and intentional and negligent infliction of emotional distress.

Defendant has moved for summary judgment on all claims. For the reasons discussed below, defendant's motion is GRANTED IN PART and DENIED IN PART.

### I. Factual background

While much of the following factual account is undisputed, where there is disagreement, the version of events presented below reflects the facts as viewed in the light most favorable to plaintiff, the non-moving party.

On May 3, 1999, Ms. Barstow was scheduled to report to work at 3:00 p.m. Prior to the beginning of her shift, plaintiff telephoned defendant Shea's administrative assistant and informed her that she would be taking personal leave to attend a meeting with the Employee Assistance Program to discuss an incident that had occurred the day before between plaintiff and two staff nurses, in which plaintiff believed the nurses had been insubordinate and hostile towards her. Plaintiff stated that she would be late reporting to her shift and that she might not be able to stay for the duration of her shift because she was ill. Plaintiff also spoke to her supervisor, Jean Walden, and informed her that she was coming to work but did not know if she could stay for the entire shift.

**144**

Following the meeting with the Employee Assistance representative, plaintiff arrived at approximately 4:00 for her shift, and was asked to meet with Shea and Walden. During that meeting, the three discussed the May 2 incident. Plaintiff states that she requested union representation, but that she was informed that it was unnecessary during this meeting. At that time, plaintiff informed them that she needed to leave because she was upset about the previous day's incident and because she did not feel well. While plaintiff did not tell them she had poison ivy, she testified in her deposition that her face, neck and arms were covered with a raised and inflamed rash, and that the condition was very conspicuous. Co-workers corroborated her testimony that the rash was obvious.

After plaintiff stated that she needed to leave, Shea refused to let plaintiff leave, and instead ordered her to complete a Medical Incident Report and take her post. Plaintiff refused, and stated again that she was leaving. Plaintiff signed out for the day at 4:45 p.m., but as she approached the door, Ms. Shea ordered Officer Garfield Nicolas, who was guarding the door: "Don't open the door; do not let her out." Plaintiff was shocked, and told Ms. Shea that she was being ridiculous and that she had signed out sick to her doctor; plaintiff also asked Officer Nicolas to open the door. Ms. Shea did not respond and simply stared at Officer Nicolas. Plaintiff began experiencing severe anxiety and became panicked and light-headed. According to Ms. Shea, she ordered Nicolas not to let plaintiff leave because she wanted to wait for a supervisor to witness her giving plaintiff a "direct order" and plaintiff's failure to comply therewith.

Plaintiff then went back to the treatment room, where her co-workers Carol Monette and Don Wells were on duty. She completed the report, and returned to the exit area, where Ms. Shea was standing in front of the door with her arms folded. Plaintiff was informed by Ms. Shea that she had to have another nurse complete the report and conduct a medical evaluation. Plaintiff repeated that she needed to leave due to her illness, but Ms. Shea responded that she did not look sick, and ordered plaintiff to have the report completed by another nurse. Despite plaintiff's protests that she needed to leave, Lieutenant Kenneth Atkins, who had since arrived at the exit area, ordered plaintiff to comply with Shea's orders. According to Ms. Monette, she heard Atkins repeat plaintiff's name over and over, while insisting that "you can't leave."

Plaintiff then returned to the treatment room, and asked Carol Monette to evaluate her and complete the form. Ms. Monette did so, and recorded plaintiff's pulse at 154 beats per minute and blood pressure at 140 over 80. The report also documents that plaintiff had a rash on her face, neck and arms, and recommended "Hospital ER" as follow-up treatment. During her deposition, Ms. Monette explained that "I evaluated her to the best of my ability. My advice was she should be allowed to leave and see her doctor due to the fact that her blood pressure was extremely elevated, she was extremely anxious, her pulse rate was elevated. I felt that she should be allowed to leave and seek medical care, and that's what I put on the evaluation, on the medical evaluation." Monette Dep. at 11.

Plaintiff then called Pauline Greene, her union representative with the New England Health Care Employee's Union, District 1199, and asked for her assistance. Ms. Greene was informed by defendant that she could not come to the facility, and her requests to Ms. Shea to let plaintiff leave the facility were ignored. Plaintiff also called the Connecticut State Police

and informed them she was being held hostage. Trooper Becker of the State Police spoke to Ms. Shea and Lt. Atkins, and was informed by them that the dispute related to staffing and that plaintiff was not being held against her will.

Shortly thereafter, Robert Carey, a former union delegate, was contacted by Jean Walden and arrived at the scene. Mr. Carey instructed plaintiff to comply with the orders, report to her post, and grieve the incident later. Mr. Carey also told plaintiff that if she did not call back the police and tell them she was not being held hostage Commissioner Armstrong would come would walk her out himself. Although plaintiff protested to Carey that he was no longer her union representative, she feared losing her job, and reluctantly complied with the instruction to call Trooper Becker.

In a state of fear and distress, plaintiff then went upstairs for her shift, and Ms. Shea left the facility. Plaintiff telephoned Ms. Shea at approximately 6:30 p.m., and repeated that she needed to leave because she was ill. Ms. Shea allegedly informed plaintiff that she was "free to leave." Plaintiff replied that without replacement she could not leave the facility understaffed, but Ms. Shea simply repeated that plaintiff was "free to leave." Unwilling to leave the facility understaffed, plaintiff worked the remainder of her shift and left at approximately 11:30 p.m.[1]

Plaintiff sought medical care for her poison ivy, elevated blood pressure and anxiety the next morning, and was prescribed medication. She returned to work May 5, and worked until May 18, 1999, when she went out on medical disability due to her depression and anxiety. Plaintiff returned to work in February 2000.

## II. Standard

Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law," Fed.R.Civ.P. 56(c). It may be granted "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). An issue of fact is "material" for these purposes if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In assessing the record, the court must draw all reasonable inferences and resolve all ambiguities in favor of the non-moving party. *Ametex Fabrics, Inc. v. Just In Materials, Inc.*, 140 F.3d 101, 107 (2d Cir.1998) (citations omitted).

## III. Discussion

### A. § 1983 Claims

As a preliminary matter, defendant has moved to dismiss the claims against her in her official capacity seeking money damages or retrospective injunctive relief as barred by the Eleventh Amendment and sovereign immunity. In response, plaintiff argues that she seeks money damages against defendant solely in her individual capacity, but seeks prospective injunctive relief against Ms. Shea in her official capacity on her constitutional claims.

Prospective injunctive relief, unlike monetary damages, is available against a state officer in his official capaci-

---

1. While plaintiff had been scheduled to work an additional overtime shift immediately following her scheduled shift, Ms. Shea arranged for coverage for that time period, and plaintiff did not have to work overtime.

ty under the doctrine of *Ex Parte Young*, 209 U.S. 123, 159–160, 28 S.Ct. 441, 52 L.Ed. 714 (1908): "the Supremacy Clause creates an implied right of action for injunctive relief against state officers who are threatening to violate the federal Constitution or laws." *Burgio & Campofelice, Inc. v. New York State DOL*, 107 F.3d 1000, 1006 (2d Cir.1997) (*quoting* 13B C. Wright, A. Miller & E. Cooper, Federal Practice & Procedure: Jurisdiction 2d § 3566, at 102 (1984)). The implied right of action, however, is unnecessary because § 1983 allows for injunctive relief against state officials, and when sued for prospective injunctive relief in his official capacity, a state officer is a "person" for the purposes of § 1983. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 n. 10, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) (*citing Kentucky v. Graham*, 473 U.S. 159, 167 n. 14, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985); *Ex parte Young*, 209 U.S. at 159–160, 28 S.Ct. 441).

■ Nonetheless, a plaintiff seeking to invoke the jurisdiction of the federal courts in order to seek prospective injunctive relief must demonstrate, *inter alia*, that "a federal court decision is likely to redress the injury." *Deshawn E. v. Safir*, 156 F.3d 340, 344 (2d Cir.1998) (*citing Northeastern Fla. Ch. of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 663, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993)). "A plaintiff seeking injunctive or declaratory relief cannot rely on past injury to satisfy the injury requirement but must show a likelihood that he or she will be injured in the future." *Deshawn*, 156 F.3d at 344 (*citing City of Los Angeles v. Lyons*, 461 U.S. 95, 105–106, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983)). Here, as plaintiff has provided no evidence of any likelihood of recurrence of the events of May 3, the claims for prospective injunctive relief against Ms. Shea in her official capacity must be dismissed. *Compare Deshawn*, 156 F.3d at 344–45 (holding that

a class of juveniles had standing to seek injunctive relief in federal court against future interrogations by a police squad because of the strong likelihood that the challenged interrogation methods would be used again). Accordingly, the only remaining constitutional claims are against defendant in her individual capacity.

1. Unreasonable seizure

■ In her motion for summary judgment, defendant characterizes plaintiff's unreasonable seizure claim as a Fourteenth Amendment procedural due process claim, and argues that the adequacy of the post-deprivation remedy provided by the Union grievance process forecloses plaintiff's claim. However, plaintiff alleges that she was held against her will when defendant ordered Officer Nicolas not to open the door and then continued to refuse plaintiff's requests for permission to leave the facility, in violation of the Fourth Amendment's right to be free from unreasonable seizures. The gravamen of her claim is thus a substantive Fourth Amendment violation, rather than procedural due process, and the existence *vel non* of a post-deprivation remedy is immaterial. *Cf. Kia P. v. McIntyre*, 235 F.3d 749, 758 (2d Cir.2000) (an infant's constitutional claim based on hospital's refusal to release her to her parents after testing revealed methadone in the child's urine is properly analyzed under the Fourth Amendment); *see also Zinermon v. Burch*, 494 U.S. 113, 124, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990) (distinguishing between Fourth Amendment claims and Fourteenth Amendment procedural due process claims, and noting that a plaintiff alleging a violation of her right to freedom from unreasonable searches and seizures "may invoke § 1983 regardless of any state tort remedy that might be available to compensate [her] for the deprivation of these rights"). Thus, defendant's argument, which is directed

toward a procedural due process claim, is misplaced.

■ The Fourth Amendment right to be free from unreasonable searches and seizures is applicable to state officers through the Fourteenth Amendment. *Duncan v. Louisiana,* 391 U.S. 145, 148, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968) (*citing Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961)). "[T]he Fourth Amendment protects individuals from unreasonable searches [and seizures] conducted by the Government, even when the Government acts as an employer ...." *National Treasury Employees Union v. Von Raab,* 489 U.S. 656, 665, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989) (internal citations omitted). In addition, "the Fourth Amendment governs 'seizures' of the person which do not eventuate in a trip to the station house and prosecution for crime— 'arrests' in traditional terminology." *Terry v. Ohio,* 392 U.S. 1, 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). "A 'seizure' occurs where, 'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *Kia P.,* 235 F.3d at 762 (*quoting United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980)); *accord Gardiner v. Incorporated Village of Endicott,* 50 F.3d 151, 155 (2d Cir.1995).

■ Here, notwithstanding defendant's arguments that plaintiff was never physically restrained, a reasonable factfinder clearly could conclude that by ordering Officer Nicolas not to open the door, Shea ensured that Barstow was physically unable to leave the facility. Moreover, after the initial incident, Shea allegedly stood between Barstow and the door, and repeatedly refused her requests to leave. As plaintiff observed during her deposition:

"To tell somebody in front of another person, 'Do not let her out. Do not open

the door.' when those people hold the keys that open the door and close the door speaks pretty clearly to false imprisonment."

Barstow Dep. at 78. Plaintiff's co-workers similarly stated in their depositions that Barstow was not free to leave during this incident. While it is less clear that the seizure continued when Barstow went to her post after Shea left the facility, because the jury could conclude that Shea's comment that Barstow was "free to leave" was a grant of permission, rather than an acknowledgment that Ms. Barstow was prevented from leaving prior to that comment, the Court concludes that defendant is not entitled to summary judgment on the grounds that no restriction of plaintiff's liberty occurred.

The "question then becomes whether the seizure was reasonable under the circumstances." *Sponito v. City of New York,* No. 84 Civ. 3937(PKL), 1986 WL 6158, at *4 (S.D.N.Y. May 28, 1986); *see also Biehunik v. Felicetta,* 441 F.2d 228, 230 (2d Cir.1971). The reasonableness of a seizure under the Fourth Amendment depends on balancing the individual's right to privacy with the government's need for the seizure, based on all the circumstances of the particular case. *See Maryland v. Wilson,* 519 U.S. 408, 411, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997); *Biehunik,* 441 F.2d at 230.

No reason has been articulated justifying the seizure, other than Ms. Shea's statement that she wanted to have a superior officer observe plaintiff's refusal to comply with a direct order. Based on the evidence in the record, however, a jury could conclude that after Lt. Atkins arrived, Barstow continued to refuse to comply and repeatedly sought to leave, and Shea continued to prevent her from leaving. Thus, defendant has not shown that a reasonable fact-finder would be compelled

to accept the explanation proffered by Ms. Shea, and defendant is not entitled to summary judgment on plaintiff's Fourth Amendment claim (Count One).[2]

### 2. Equal protection

Plaintiff also asserts that Ms. Shea's insistence that she have a fellow nurse complete a Medical Incident Report before she could leave denied her equal protection of the laws because other employees have been allowed to leave without complying with this requirement. According to defendant, "[w]ithin the Department of Correction and UCONN, it is the usual practice and procedure that if an employee becomes ill at work, he or she must report it to the supervisor, find coverage, be seen in the medical unit and have a medical incident report completed, which would record the employee's condition. This policy is an unwritten policy within the Department of Correction and UCONN, and is not always followed as it should be." Def. Br. at 12.

■ The Equal Protection Clause requires that the government treat similarly situated people alike. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). "Although the prototypical equal protection claim involves discrimination against people based on their membership in a vulnerable class, we have long recognized that the equal protection guarantee also extends to individuals who allege no specific class membership but are nonetheless subjected to invidious discrimination at the hands of government officials." *Harlen Assoc. v. Incorporated Village of Mineola*, 273 F.3d 494, 499 (2d Cir.2000) (*citing LeClair v. Saunders*, 627 F.2d 606, 608–10 (2d Cir.1980)). In *Village of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S.Ct. 1073,

145 L.Ed.2d 1060 (2000) (per curiam), the Supreme Court recently affirmed the validity of such "class of one" claims "where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." To prevail on a "class of one" equal-protection claim, plaintiff must "show, not only 'irrational and wholly arbitrary' acts, but also intentional disparate treatment." *Giordano v. City of New York*, 274 F.3d 740, 751 (2d Cir.2001) (*quoting Olech*, 528 U.S. at 564, 120 S.Ct. 1073).

■ Defendant argues that she is entitled to summary judgment because plaintiff cannot show that she was treated differently or that the policy was applied to her in a discriminatory fashion. However, plaintiff has come forward with evidence suggesting that other employees left work sick without being required to have a co-worker complete a Medical Incident Report. For example, Jean Walden testified in her deposition that when she left work in 1999 or 2000, she simply stated that she had a doctor's appointment and needed to leave, and Shea did not require her to complete the form. *See* Walden Dep. at 83–84. Similarly, Carol Monette testified that she has left work due to illness without being required to complete a Medical Incident Report. *See* Monette Dep. at 24–25. According to Ms. Monette, Medial Incident Reports were only required when an employee was injured on the job. *Id.* Thus, the jury could conclude that plaintiff was treated differently from other similarly situated employees.

In addition, while defendant claims that the policy was strictly enforced here because plaintiff gave conflicting reasons for

---

**2.** The Court therefore expresses no view as to whether the reason articulated by Ms. Shea is sufficient to make the detention of plaintiff

against her will reasonable under the circumstances.

needing to leave early—in her distress resulting from the May 2 incident and the fact that she did not feel well, plaintiff maintains that she repeatedly informed defendant that she needed to leave to seek medical attention. Thus, the jury could discredit the reason given by defendant for the differential treatment, and could conclude that Ms. Shea's insistence that plaintiff have her Medical Incident Report completed by a co-worker despite her claims of serious illness and that she needed to leave immediately to seek treatment was arbitrary, intentional disparate treatment. Accordingly, summary judgment is inappropriate on this claim (Count Two).

### 3. Qualified immunity

 Finally, defendant argues that she is entitled to qualified immunity from suit on the constitutional challenges. A government official sued in her individual capacity is entitled to qualified immunity "where it was objectively reasonable to believe that her acts did not violate clearly established federally protected rights." *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir.1996). "The qualified immunity defense may be upheld as a matter of law when the evidence is such that, even when it is viewed in the light most favorable to the plaintiffs and with all reasonable inferences drawn in their favor, no rational jury could fail to conclude that it was objectively reasonable for the defendant to believe that she was acting in a fashion that did not violate such a right." *Id.*

Defendant does not dispute that it was clearly established in 1999 that a person could not be unreasonably seized or arbitrarily subjected to differential treatment. Instead, she asserts that because she simply wanted plaintiff to follow the rules and regulations of her employer, she acted with a good faith belief that her acts were constitutional. However, defendant has not offered any evidence that DOC or UCONN policy required or even permitted physical detention of an employee who wished to leave the facility in violation of a direct order. Moreover, viewing all facts in the light most favorable to plaintiff, the record currently before the Court does not compel the conclusion that an objectively reasonable official in defendant's position could disagree as to the legality of her actions, as the jury could find that detaining plaintiff and requiring her to complete a Medical Incident Report form, despite her protests that she needed to leave for medical reasons, was sufficiently arbitrary and unreasonable that other officials "of reasonable competence" would not have believed it was lawful. *Cf. Cerrone v. Brown*, 246 F.3d 194, 202 (2d Cir.2001) ("A defendant is … entitled to summary judgment on qualified immunity grounds if a jury, viewing all facts in the light most favorable to the plaintiff, could conclude that officers of reasonable competence could disagree on the legality of the defendant's actions.") (citations and quotations omitted). Defendant has therefore not proved her entitlement to qualified immunity at this stage.

### B. *State law claims*

#### 1. False Imprisonment

" '[F]alse imprisonment is the unlawful restraint by one person of the physical liberty of another.' " *Rivera v. Double A Transp. Inc.*, 248 Conn. 21, 31, 727 A.2d 204 (1999) (*quoting Felix v. Hall–Brooke Sanitarium*, 140 Conn. 496, 499, 101 A.2d 500 (1953)). " 'A person is not liable for false imprisonment unless his act is done for the purpose of imposing a confinement, or with knowledge that such confinement will, to a substantial certainty, result from it.' " *Rivera*, 248 Conn. at 31, 727 A.2d 204 (*quoting Green v. Donroe*, 186 Conn. 265, 268, 440 A.2d 973 (1982) (internal citations omitted)).

**[11]** Defendant argues that plaintiff's false imprisonment claim must be dismissed because she was not detained, and further argues that the circumstances of an employer ordering an employee not to leave cannot amount to false imprisonment as a matter of law. As previously discussed, the Court disagrees with defendant's position that a jury could not conclude that plaintiff's physical liberty was restrained by Shea when Shea ordered Nicolas not to open the door. Similarly, while an employer's mere refusal of *permission* to leave may not amount to false imprisonment, *see* Def. Br. at 25, here plaintiff was *physically* prevented from leaving a locked facility from which there was no other means of escape. Defendant's motion for summary judgment is therefore denied as to this Count.

## 2. Intentional Infliction of Emotional Distress

■■■ Under Connecticut law, to prove intentional infliction of emotional distress, plaintiff must show (1) that the defendant intended to inflict emotional distress, (2) that its conduct was extreme and outrageous, (3) that the defendant's conduct caused the plaintiff distress and (4) that the distress suffered by the plaintiff was severe. *See DeLaurentis v. City of New Haven,* 220 Conn. 225, 266–67, 597 A.2d 807 (1991). Conduct is deemed extreme and outrageous where it "exceeds all bounds usually tolerated by a decent society." *Appleton v. Board of Educ. of the Town of Stonington,* 254 Conn. 205, 210, 757 A.2d 1059 (2000) (internal quotations and citations omitted). "Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!' " *Id. (quoting* 1 Restatement (Second), Torts § 46, cmt. d (1965)).

Defendant argues that she is entitled to summary judgment on this Count because the acts alleged, as a matter of law, do not amount to extreme and outrageous conduct, citing *Snyder v. J.M. Ney Co.,* No. H–85–653(JAC), 1987 WL 14970 (D.Conn. 1984). However, the conduct in *Snyder* is substantially different from that alleged here. In that case, the court found that the plaintiff's allegations of receiving warnings and poor performance evaluations, being hounded and harassed by her supervisor repeatedly, and being advised by her supervisor to take early retirement were insufficiently extreme and outrageous to state a claim.

■■■ Here, in contrast, plaintiff was physically prevented from leaving her place of employment—a prison—by her supervisor, who ordered a correctional officer not to unlock the door, despite plaintiff's pleas that she be allowed to leave for medical reasons. This is thus not a situation in which an employee is simply criticized or even harassed, but rather a coercive exercise of power by a supervisor over a subordinate in which plaintiff was deprived, albeit temporarily, of her liberty. Plaintiff became extremely agitated in response, and the situation upset her other co-workers, who feared that they might be subjected to similar treatment and were also concerned because the incident occurred in front of inmates. Plaintiff's deposition testimony reveals that part of the cause of her distress was that she "was treated like a criminal," Barstow Dep. at 90, a perception that could reasonably be found to be all the more disturbing in the context of her employment in a prison. Accordingly, the Court concludes that a reasonable jury could find that the circumstances here were sufficiently outrageous to state a cause of action.

Alternatively, defendant argues that plaintiff's emotional distress was caused by the May 2 incident, and that she is entitled to summary judgment because the May 3

conduct was not the cause of plaintiff's emotional distress. This argument too is unavailing, as the record contains ample evidence from which the fact-finder could determine that while plaintiff was upset about the May 2 incident, the May 3 incident with defendant greatly exacerbated her distress.

### 3. Negligent Infliction of Emotional Distress

Finally, defendant argues that she is entitled to summary judgment on plaintiff's claim of negligent infliction of emotional distress because Connecticut General Statutes § 4–165 expressly grants state officers and employees immunity from liability for negligent conduct.

Connecticut General Statutes § 4–165 provides that: "[n]o state officer or employee shall be personally liable for damage or injury, not wanton, reckless or malicious, caused in the discharge of his duties or within the scope of his employment." Conn. Gen.Stat. § 4–165.

> In order to establish that the defendants' conduct was wanton, reckless, wilful, intentional and malicious, the plaintiff must prove, on the part of the defendants, the existence of a state of consciousness with reference to the consequences of one's acts.... [Such conduct] is more than negligence, more than gross negligence.... [I]n order to infer it, there must be something more than a failure to exercise a reasonable degree of watchfulness to avoid danger to others or to take reasonable precautions to avoid injury to them.... It is such conduct as indicates a reckless disregard of the just rights or safety of others or of the consequences of the action.... [In sum, such] conduct tends to take on the aspect of highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger is apparent....

*Shay v. Rossi,* 253 Conn. 134, 181, 749 A.2d 1147 (2000) (citations omitted).

While plaintiff notes that she has alleged that defendant's acts were "willful and/or wanton in that they were taken with the intent to harm plaintiff or in reckless disregard of plaintiff's rights," Amended Compl. ¶ 68, that allegation effectively converts her "negligent" infliction of emotional distress claim into a claim for "intentional" infliction of emotional distress. Accordingly, the Court finds that to the extent plaintiff is claiming intentional infliction of emotional distress, that claim is properly considered as part of Count Four, but that the claim for negligent infliction of emotional distress (Count Five) must be dismissed as barred by Conn. Gen.Stat. § 4–165. *See, e.g., Le v. Connecticut Dep't of Transp.,* No. CV 980491121S, 1999 WL 619631, *4 (Conn.Super.Aug.4, 1999) (dismissing claim of negligent infliction of emotional distress as barred by Conn. Gen.Stat. § 4–165); *Cates v. State of Connecticut Dep't of Corrections,* No. 3:98CV2232(SRU), 2000 WL 502622, *14 (D.Conn. April 13, 2000) (same).

### IV. Conclusion

For the reasons set forth above, defendant's motion for summary judgment [Doc. # 23] is GRANTED IN PART and DENIED IN PART. The motion is GRANTED as to plaintiff's claims against Ms. Shea in her official capacity and as to the claim of negligent infliction of emotional distress (Count Five) and is DENIED in all other respects.

IT IS SO ORDERED.